UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.

**05-80498** CIV-RYSKAMP

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOUIS R. CAPECE, JR., GEORGE
CAPECE, SR. and GEORGE CAPECE,
JR.

     Plaintiffs,

 -against-

THE DEPOSITORY TRUST AND CLEARING
CORPORATION; THE DEPOSITORY TRUST
COMPANY; and THE NATIONAL
SECURITIES CLEARING CORPORATION,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MAGISTRATE JUDGE
VITUNAC

## NOTICE OF AND PETITION FOR REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants The Depository Trust & Clearing

Corporation ("DTCC"), The Depository Trust Company ("DTC"), and National Securities Clearing

Corporation ("NSCC") (collectively, "Defendants" or "DTCC"), by their counsel, hereby give notice

of the removal of this action from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm

Beach County Florida, where it is pending as Case No. 2005CA004041. (A copy of all process,

pleadings and orders served upon Defendants is attached as Exhibit 1.) As set forth below, putative

state law claims are completely preempted by the comprehensive federal regulatory scheme

governing the subject of plaintiffs' Complaint. The Complaint is an on-its-face challenge to a

program that is an element of the national system for clearing and settlement of securities

transactions, subject to the jurisdiction of, governed by, and specifically approved by, the U.S.

Securities and Exchange Commission ("SEC"). Because the field of securities clearing and

settlement has been so thoroughly occupied by federal law as to preempt any purported state

regulation of the federally-authorized practices challenged by plaintiffs here, the present action is removable to this Court under the complete preemption doctrine notwithstanding plaintiffs' attempts to characterize their claims as arising under Florida state common law. *See* Point IV.A.

Indeed, it should be emphasized at the outset that a state court in Nevada has recently dismissed a complaint materially identical to the Complaint in this action under the federal preemption doctrine, due to the pervasive federal oversight of the matters at issue in this litigation. *Nanopierce Technologies, Inc. v. The Depository Trust and Clearing Corp., et al.*, Case No. CV04-01079 (Second Judicial Dist., Washoe Cty.) (Adams, J.) (decision attached as Exhibit 2).[1]

Further, as demonstrated below in Point IV.B., because Plaintiffs' challenge to Defendants' SEC-authorized and regulated clearing, settlement and depository functions implicate substantial federal interests in connection with the national market system for securities transactions, Plaintiffs' claims may be said to "arise under" federal law for the purpose of removal. And, as demonstrated in Point IV.C., because, at essence, the Complaint seeks to impose purported state law standards on short selling practices, this action is subject to removal under the complete preemption doctrine on that basis as well.

## I.   PROCEDURAL MATTERS

1.    Plaintiffs filed this action or about April 29, 2005 in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

2.    On information and belief, the Defendants were served with the Summons and Complaint on or about May 13, 2005.

3.    On information and belief, this Notice of Removal is timely because it has been filed within thirty (30) days after Defendants received the Summons and Complaint, as prescribed by 28 U.S.C. § 1446(b).

---

[1]    On May 18, 2005, plaintiffs in that action filed a Notice of Appeal from the decision dismissing their complaint.

4.       Under 28 U.S.C § 1441(a), venue of the removed action is proper in the Southern District of Florida, as the district where the state court action is pending.

5.       Written notification of the filing of this Notice of Removal is being made upon Plaintiffs pursuant to 28 U.S.C. § 1446(d).

6.       A copy of this Notice of Removal will be filed with the Clerk of the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Florida pursuant to 28 U.S.C. § 1446(d).

## II.   PLAINTIFFS' ALLEGATIONS

7.       Plaintiffs, purportedly shareholders of Cybercare, Inc., a Florida corporation, have filed suit against New York-based clearing and depository institutions[2] that provide services as a part of the national market system for securities transactions under the supervision of, and pursuant to explicit authorization by, the SEC. Plaintiffs' claim, characterized as "negligence," is actually a facial challenge to a program operated by Defendants under SEC supervision and authority.

8.       Plaintiffs had previously filed a materially identical case in this Court, naming DTCC and various other defendants. Following discussions between counsel for DTCC and prior counsel for Plaintiffs, the prior action was withdrawn. *See Capece v. Elgindy, et. al,* United States District Court, Southern District of Florida, West Palm Beach Division, Case No. 04-80403 (Exhibit 3) (the "First Action").

9.       In this action, as in the First Action, Plaintiffs' claims are premised on the operation of the Stock Borrow Program ("SBP"), a component of NSCC's clearing and settlement system that has explicitly been approved by the SEC. Plaintiffs allege that Defendants' operation of the SBP in connection with short selling of Cybercare stock (by various selling brokers who are not

---

[2]       Defendant DTCC is the parent corporation of both NSCC and DTC. DTC is the nation's principal securities depository and provides depository services for its bank and brokerage house Participants to facilitate "book-entry" transfers of securities. NSCC provides clearing and settlement services for most equity transactions in the U.S. markets, including purchases, sales and transfers of securities by its Member brokers. Plaintiffs' Complaint makes no attempt to distinguish among these three separate corporate defendants, instead suing them all collectively for the alleged actions of "defendants" as an undifferentiated whole.

named as defendants) allegedly caused Plaintiffs' damages.  (*See, e.g.,* Compl. ¶¶ 43, 47, 48, 62.)
Putting aside the validity of this claim (and there is none), because Plaintiffs seek to apply Florida
negligence law to a field entirely preempted by the federal government,[3] and one which otherwise
implicates a substantial federal interest, their Complaint should be removed to this Court, and
thereafter dismissed.

## III.  THE UNIFORM NATIONAL MARKET SYSTEM FOR THE CLEARANCE AND SETTLEMENT OF SECURITIES TRANSACTIONS

10.    NSCC's clearing and settlement activities, including the SBP, are part and
parcel of a comprehensive federal scheme to ensure uniformity and efficiency in the national market
system for securities transactions.

11.    Since 1934, Congress has directed that there be uniform regulation of the
national securities markets.  As set forth in the preamble of the Securities Exchange Act of 1934 (the
"Exchange Act"), Congress intended to "provide for the regulation of securities exchanges and of
over-the-counter markets operating in interstate and foreign commerce."  Pub. L. No. 73-291, 48 Stat.
881 (1934) (codified and amended at 15 U.S.C §§ 78a-78kk).  In 1975, Congress added Section 17A
to the Exchange Act in order to remove impediments to a uniform national system for the prompt and
accurate clearance and settlement of securities transactions.  In adopting Section 17A, Congress set
forth specific findings regarding the need for the prompt and accurate clearance and settlement of
securities transactions.  15 U.S.C. § 78q-1(a)(1)(A); *see also Self-Regulatory Organizations; The
Depository Trust Company; Order Granting Approval Of A Proposed Rule Change Concerning
Requests For Withdrawal Of Certificates By Issuers,* SEC Release No. 34-47978, 2003 WL
21288541, at *6 (June 4, 2003) (hereafter, the "June 4 SEC Order") *citing* 15 U.S.C. § 78q-
1(a)(1)(B).  One of the legislative goals of Section 17A, according to those express findings, was "the

---

[3]    The doctrine of complete preemption compels not only removal, but dismissal of the Complaint.  Defendants
will set forth their bases for dismissal more fully in a separately-filed pleading.

development of uniform standards and procedures for clearance and settlement [of securities transactions] . . . ." 15 U.S.C. § 78q-1(a)(1)(D).

12.     In order to implement these congressional policies, Congress vested the SEC with the centralized decision-making authority to preside over a uniform national system in an effort to increase efficiency and reduce risk. 15 U.S.C. § 78q-1(a)(2)(A)(i), June 4 SEC Order, at *6. Thus, the SEC is empowered to regulate, coordinate, and direct the operations of all persons involved in processing securities transactions. In addition to granting the SEC the regulatory power to "facilitate the establishment of a national market system for securities," 15 U.S.C. § 78k-1(a)(2), Congress empowered and directed the SEC to "regulate[ ] ... every facet of the securities handling process ... clearing agencies, depositories, corporate issuers, and transfer agents." S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179, 233 (April 14, 1975); *see also* June 4 SEC Order (same). Congress granted the SEC explicit authority to regulate clearing agencies like DTC and NSCC, 15 U.S.C. § 78q-1, and to approve the regulations at issue in this case.

13.     Defendants DTC and NSCC are subsidiaries of defendant DTCC and are registered clearing agencies. As such, these entities have adopted rules under Section 19(b) of the Exchange Act, approved by the SEC, to fulfill their respective obligations in the national clearance and settlement system. *See* 15 § U.S.C. 78q-1, 15 U.S.C. § 78s.

14.     The SEC oversees clearing agency compliance with the Exchange Act in several ways. First, the SEC reviews and, if compatible with applicable law and policy, approves each agency's proposed rule changes. *See* 17 C.F.R. § 240. 17a-22; *Depository Trust Co., et. al; Order,* SEC Rel. No. 20221, 48 Fed. Reg. 45167-02, 45171 (Oct. 3, 1983). Second, "to help ensure the continuing integrity of clearing agency operations," the SEC periodically conducts clearing agency inspections. *Id.* Third, the SEC exercises on-going enforcement and rule-making authority with respect to clearing agencies. *Id.*; 15 U.S.C. § 78q-1(a)(2), (b), (d), (e); *see also* 17 C.F.R. § 240.

5

17Ab2-1, 240.19b-4.  The SEC has described its oversight of NSCC as "rigorous and thorough."  48 Fed. Reg. 45167-02, SEC Release 20221 (Oct. 3, 1983).

### The Stock Borrow Program

15.     The SBP is a component of NSCC's securities settlement system and approved by the SEC.  *See* NSCC Rules, Addendum D.; *National Securities Clearing Corp.; Proposed Rule Change,* SEC Release No. 34-17422, 46 Fed. Reg. 3104 (Jan. 7, 1981) (approving and adopting as permanent the SBP); *see also Final Rule: Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, SEC Release 34-50758, 69 Fed. Reg. 70852, 70856 n. 57 (Dec. 7, 2004)(acknowledging that the SBP had been approved by the SEC).

16.     The SBP is utilized in certain circumstances to deliver stock to NSCC's Member brokers where there are otherwise insufficient shares of that issue in the NSCC settlement system to fulfill outstanding delivery obligations.

17.     More particularly, if a selling broker does not deliver the securities it has sold on the settlement date, resulting in "fail-to-deliver," NSCC will have insufficient securities in its system to meet delivery obligation to the Member-broker(s) with a right to receive delivery.  As recognized by the SEC, fails-to-deliver can be, but are not always, caused by "naked short-selling," the practice of selling securities  "short" -- selling securities the buyer does not own -- and failing to take steps to borrow or otherwise obtain the shares necessary to make delivery on the settlement date.

18.     In certain cases where there has been a failure to deliver, NSCC utilizes the SBP to deliver securities to a Member with the right to receive delivery.  Through the SBP, the NSCC may borrow securities from a Member who has (1) voluntarily made such securities available for loan and (2) actually has such securities on deposit in its DTC account.  NSCC then uses such securities, in the same manner as other securities delivered into its settlement system, to make deliveries to Members with the right to receive delivery.  A Member who has failed to deliver nonetheless remains obligated to deliver, irrespective of the SBP.

## IV.  GROUNDS FOR REMOVAL

### A. Complete Preemption

19.     A defendant's assertion of federal preemption is generally recognized as a defense to a state law claim. *Spielman v. Merrill Lynch*, 332 F.3d 116, 130 (2d Cir. 2003) (Newman, J. concurring).  Where, however, an area of law has been *entirely preempted* by federal law, preemption is not only a defense, it requires that a complaint predicated on a preempted area of law be removed to federal court, even though the complaint is nominally framed in terms of state law.  *Id.* at 130-31; *see also, e.g., Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1 (2003) (complaint which framed its claims in terms of state law, but which came within the scope of a preemptive federal statute, was completely preempted and thus properly removed to federal court); *Shea v. Esensten*, 107 F.3d 625 (8th Cir. 1997) (complaint framed in terms of misrepresentation and fraudulent non-disclosure under Minnesota state law would affect administration of ERISA-regulated plan, and therefore was removable to federal court under complete preemption doctrine based on ERISA law). Like the above cases, the present case presents a situation of entire preemption, also known as "field preemption," and therefore the litigation should be removed to this Court.

20.     Where the scheme of federal regulation in a particular area is pervasive, courts will infer Congress' intent to supersede state law altogether in such area.  "The Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (Federal Home Loan Bank Board's regulation of mortgage contracts issued by federally-regulated savings and loans preempted state laws) *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

21.     Moreover, the Supreme Court's recent decision in *Beneficial National Bank,* 539 U.S. 1, has expanded the number and types of cases subject to removal on complete preemption grounds. *Beneficial National Bank* is a "significant shift in decisional authority from state to federal

7

courts." *Id.* at 18 (Scalia, J., dissenting).  It directs courts to consider, not whether Congress has

directed that a certain category of cases be removable, but rather whether Congress intended a federal

cause of action to be exclusive.  *Id.* at 9 n.5.  Thus, because the preemptive federal statute need not

explicitly provide for removal, the complete preemption doctrine "has been invoked in a significant –

and ever-increasing – number of cases and contexts . . . ."  WRIGHT, MILLER & COOPER, 14B

FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 3D § 3722.1 at 508 and n.1 (collecting cases).

      22.    As explained above, the Complaint in this action implicates the

Congressionally mandated scheme, overseen by the SEC,  pursuant to which NSCC and DTC

perform clearing, settlement and depository functions essential to the uniform national market system

for securities transactions.  Because Congress has mandated that the national market system be

governed by a uniform federal standard, Plaintiffs' effort to impose state law standards on the system

flatly contradicts that Congressional goal, and is preempted.[4]

      23.    Notably, a Nevada state court has recently ruled that federal law preempts state

law challenges to the SBP of the type asserted here.  In *Nanopierce Technologies, Inc. v. The*

*Depository Trust and Clearing Corporation, et al.*, Case No. CV04-01079, Judge Brent Adams

dismissed a complaint materially identical to the instant one, holding that the extensive federal

regulation of the securities industry, and especially the clearing and depository institutions,

preempted state law claims, including negligence, as well as other common law and statutory claims.

*See* Order annexed as Exhibit 2.

      24.    Even more explicitly, the SEC's Division of Market Regulation has recently

addressed the claims at issue in this litigation, further reflecting the pervasive federal oversight of

---

[4]      Defendants do not contend that all negligence claims are automatically preempted.  Rather, it is the purported *application* of Florida law, and not the law's general nature, which is relevant for preemption analysis.  As stated by the Seventh Circuit, "The crucial inquiry, we reiterate, is the context in which a law is applied."  *Am Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1157 (7th Cir. 1992) (otherwise valid state negligence and fraud laws were preempted in the context of their application to trading on a contracts market).

matters that Plaintiffs blithely seek to relegate to judicial interpretations of the laws of the 50 states,

as well as confirming that Plaintiffs' claims on the merits are simply wrong:

> **Question 7.2: Does NSCC's stock borrow program ("SBP") create "counterfeit shares"?**
>
> **Answer:** The SBP was implemented in the late 1970s to allow NSCC to satisfy its members' priority needs for stocks that they do not receive because of fails. *It is governed by NSCC rules approved by the Commission.* Under the SBP, NSCC uses shares voluntarily made available to the SBP by some of its members to complete deliveries to members that did not receive their securities on settlement day. The SBP moves securities that are actually on deposit at DTC from the lending member to the NSCC member who did not receive securities. NSCC then records the lender's right to receive the same amount of shares that it loaned just as if the lender had purchased securities but not received them (i.e., the member lending the securities replaces the member receiving the loaned securities in the CNS system). The lending and delivery of shares through the SBP, however, does not relieve the member that has failed to deliver from its obligation to deliver securities.
>
> The shares loaned by NSCC members for use in the SBP must be on deposit at DTC and are debited from members' accounts when the securities are used to make delivery. Once a member's shares are used for delivery to another member, the lending member no longer has the right to sell or relend those shares until such time as the shares are returned to its DTC account. *Accordingly, NSCC's SBP does not create "counterfeit shares." In fact, the program facilitates the delivery of securities to buyers while maintaining the obligation of the sellers to deliver securities to NSCC.* This outcome is consistent with the NSCC's obligation to facilitate the prompt and accurate clearance and settlement of securities transactions and in general to protect investors and the public interest.

*See* http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm (emphasis added) (Exhibit 4).[5]

25.     Accordingly, as a component of its regulation of Defendants' clearing,

settlement and depository functions, the SEC has explicitly approved the program that Plaintiffs in

this action have challenged under state common law principles.  Plaintiffs' effort to apply state law

standards to interfere in the uniform regulation of the securities industry, and effectively to invalidate

---

[5]     Similarly, in July 2004, the SEC had debunked the theory of liability Plaintiffs raise here.  In stark contrast to Plaintiffs' claims that the SBP somehow "artificially increase[es] the supply of shares" of the borrowed security, the SEC recognized that:

> The Commission notes that NSCC's stock borrow program, as approved by the Commission, permits NSCC to borrow securities for the purpose of completing settlements only if participants have made those securities available to NSCC for this purpose and those securities are on deposit in the participant's account at The Depository Trust Company.

Short Sales Final Rule Interpretation, 69 Fed.Reg. 48008 n.85.

a program authorized by federal regulatory authorities, is a clear case for the invocation of the preemption doctrine and requires removal of this action to this Court.

### B. The Substantial Federal Interest in Clearing, Settlement and Short-Selling of Securities Requires Removal

26.     Even if this action were not completely preempted (and it is), the Complaint should nonetheless be removed on the grounds that any resolution of the claims presented would necessarily implicate a substantial federal interest.  In *D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93 (2d Cir. 2001), the plaintiffs challenged the actions of a self-regulatory organization, in that case the NYSE.  The court held that, while D'Alessio's claims were cast as ones of state law (tort and breach of contract), they necessarily implicated the propriety of the NYSE's actions, which could only be determined by an inquiry into the scope of the NYSE's duties under federal law and regulation.  *Id.* at 103.  Accordingly, and particularly in light of the comprehensive scheme of statutes and regulations designed to police the securities industry, "the federal interest underlying D'Alessio's claims is sufficiently substantial to 'arise under' federal law within the meaning of section 1331."  *Id.* at 104; *see also Frayler v. New York Stock Exch.*, 118 F. Supp. 2d 448, 451 (S.D.N.Y. 2000) (underlying substantive issue in plaintiff's state-law complaint against Exchange was whether its actions were proper under federal law; removal to federal court was therefore "fully justified").[6]

27.     Like the plaintiffs in *D'Alessio* and *Frayler*, Paintiffs' claims here implicate the comprehensive statutory and regulatory scheme surrounding defendants and their clearing and settlement activities (and are subject to dismissal on preemption grounds).  Accordingly, the Complaint "arises under" federal law notwithstanding its nominal designation as a state law claim, and is removable to this Court.

---

[6]     *D'Alessio* and *Frayler* were decided before the Supreme Court's decision in *Beneficial National Bank*, which clarified that Congressional intent to create an exclusive cause of action, regardless of whether Congress also expressly intended actions to be removable, was itself enough to invoke complete preemption.  In light of this clarification, the courts determining *D'Alessio* and *Frayler* arguably would have held the suits against self-regulatory organizations to be completely preempted in light of that decision.  In any event, whether characterized as "complete preemption" or "substantial federal question" precedents, these cases support removal of the present action.

## C.  The Complete Preemption of Challenges to Short Selling Practices

28.     Although the Complaint constitutes a direct challenge to the SEC-approved SBP, Plaintiffs' underlying goal is to stem naked short selling activities that have allegedly been directed against Cybercare by persons who are not parties to this action.  This field, too, has been completely preempted by federal regulation of short selling practices, and provides an independent basis for removal to this Court.

29.     Rule 10(a) (15 U.S.C. § 78j) of the Securities Exchange Act of 1934 (the "Manipulative and Deceptive Devices Rule") explicitly gives the SEC "plenary authority to regulate short sales of securities registered on a national securities exchange, as necessary to protect investors."  Short Sales, Exchange Act Release No. 34-42037, 1999 SEC LEXIS 2232, File No. S7-24-99 (Oct. 20, 1999).  The SEC is authorized to promulgate regulations governing short sales, which was first done in 1938.  Rule 10a-1, 17 C.F.R. § 240.10a-1, sets forth general standards governing the relationship of terms of short sales and previously quoted prices, and Rule 10a-2, 17 C.F.R. § 240.10a-2, regulates the covering of short sales and the practice of naked short-selling.  *See also* June 4 SEC Order, at *6 ("DTC does not allow its participants to establish short positions resulting from their failure to deliver securities at settlement.");  NASD Rules 3210 ("Securities 'Failed to Receive' and 'Failed to Deliver'"), 3350 ("Short Sale Rule"); 3360 ("Short Interest Reporting"); 3370 ("Prompt Receipt and Delivery of Securities") and 11830 ("Mandatory Close-Out for Short Sales"); New York Stock Exchange Rule 440C.10 (requiring a diligent effort to borrow securities prior to a "fail to deliver"); NASD Notice to Members 93-53 at n.5 and accompanying text, 1993 WL 1434136 (Aug. 1993) (discussing fails to deliver).

30.     The SEC has recently adopted Regulation SHO, a comprehensive and sweeping rule regarding short-selling practices, including the practice at issue here, naked short selling.  *See* Short Sales, Final Rule, 69 Fed.Reg. 48008, 2004 WL 17484721 (Aug. 6, 2004).  In

particular, Regulation SHO requires brokers to ensure that stock is available to be borrowed before

engaging in short sales.  Failure to comply (thus resulting in naked short selling) subjects the broker

to sanctions, including foreclosing the broker from making future short sales.  It is inconceivable,

given the scope and breadth of Regulation SHO's coverage of short selling and naked short selling

that the federal government has left *any* room for state regulation of those practices.

    31.  Even before the adoption of Regulation SHO, the field preemption doctrine

had been utilized to prevent the prospect of the laws of the 50 states being applied to the uniform

federal scheme governing short selling.  In *Levitin v. Paine Webber, Inc.*, 159 F.3d 698, 706 (2d Cir.

1998), the court broadly concluded that, in light of pervasive federal scheme governing short sales,

state regulation regarding this activity was impermissible under preemption doctrine; *see also Shulick*

*v. PaineWebber, Inc.*, 722 A.2d 148, 151 (Pa. 1998) (comprehensive federal regulation regarding

broker disclosures of order flow payments preempted additional state law regulation); *Guice v.*

*Charles Schwab & Co.,* 674 N.E.2d 282, 290 (N.Y. 1996) ("Permitting the courts of each State to

impose civil liability on national securities brokerage firms . . . would inevitably defeat the

congressional purpose of enabling the SEC to develop and police that 'coherent regulatory structure'

for a national market system"); *Orman v. Charles Schwab & Co.*, 688 N.E.2d 620, 626 (Ill. 1997)

(Congress intended to foster a national market system; permitting plaintiffs' state law claims would

frustrate such goal); *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147,

1156 (7th Cir. 1992) (state law fiduciary duty and negligence claims were preempted as against the

Chicago Board of Trade by the Congressional intent for a uniformly-regulated market); *X-Clearing*

*Corp. v. Depository Trust Co.*, No. 03 CV 1169 (JNM), slip op. at 3 (Dist. Ct. Colo. Oct. 3, 2003)

(plaintiff's resort to state law claim in support of issuer's effort to exit shares from the DTC system in

order to prevent naked short selling were preempted because the "statutory scheme shows an *intent*

*on the part of Congress to preempt that area of law governing the operation of processing securities*

*transactions for publicly-traded securities*") (emphasis added) (Exhibit 5).

32.     Accordingly, in addition to the other grounds for removal set forth above, because the Complaint implicates the regulation of short selling practices – a matter subject to pervasive federal regulation – the negligence claim is completely preempted, subject to removal and, thereafter should be dismissed.

## V.     REMOVAL JURISDICTION

33.     Defendants respectfully request that the United States District Court for the Southern District of Florida issue such orders and process as are necessary to preserve its jurisdiction over this matter.

34.     Written notice of the filing of this Notice of and Petition for Removal has been served on Plaintiffs and a copy of this notice will be filed with the Clerk of the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, simultaneously with the filing of this document with this Court, pursuant to 28 U.S.C. § 1446(d).

This _2^nd_ day of June, 2005.

PROSKAUER ROSE LLP
Attorneys for Defendants
2255 Glades Road, Suite 340-West
Boca Raton, Florida 33431
Telephone: (561) 241-7400
Telecopy:  (561) 241-7145

By: _____
Matthew Triggs
Florida Bar No. 0865745
mtriggs@proskauer.com

Of Counsel:
Gregg M. Mashberg
(*Pro hac vice* application forthcoming)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
Tel: (212) 969-3000
Fax: (212) 969-2900

## CERTIFICATE OF SERVICE

I certify that on June 2, 2005, a copy of this document was sent by U.S. Mail and facsimile to

Alan C. Espy, Attorney for Plaintiff, 3300 PGA Boulevard, Suite 630, Palm Beach Gardens, FL.

33410.

_____
Matthew Triggs

14

# Exhibit 1

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO

LOUIS R. CAPECE, JR., GEORGE
CAPECE, SR. and GEORGE CAPECE,
JR.,

      Plaintiffs,

Vs.

THE DEPOSITORY TRUST AND
CLEARING CORPORATION; THE
DEPOSITORY TRUST COMPANY;
and THE NATIONAL SECURITIES
CLEARING CORPORATION.

      Defendant.

_____/

**50 2005CA004041 XXXXXX**



## CIVIL ACTION SUMMONS

THE STATE OF FLORIDA.

To Each Sheriff of the State

YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition on Defendant

      THE DEPOSITORY TRUST AND CLEARING CORPORATION

      By Serving:

      Anthony Alizzi, Managing Director
      55 Water Street
      New York, New York

Each Defendant is required to serve written defenses to the Complaint or Petition on

      ALAN C ESPY, ESQ
      Alan C. Espy, P A

Plaintiffs Attorney, whose address is:

      3300 PGA Blvd., Suite 630
      Palm Beach Gardens, FL 33410
      (561) 6274775

within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of
the defenses with the Clerk of this Court either before service on Plaintiffs attorney or immediately thereafter If a Defendant fails to
do so, a Default will be entered against that Defendant for the Relief demanded in the Complaint or Petition.

      DATED on_____ **APR 29 2005**

Clerk of the Court

**CATHERINE MAY.**

By_____

      Deputy Clerk

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
Palm Beach, Florida

57

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 2005 CA 004041 XXXX

LOUIS R. CAPECE, JR., GEORGE
CAPECE, SR. and GEORGE CAPECE,
JR.,

      Plaintiffs,

Vs.

THE DEPOSITORY TRUST AND
CLEARING CORPORATION; THE
DEPOSITORY TRUST COMPANY;
and THE NATIONAL SECURITIES
CLEARING CORPORATION,

      Defendant.
_____/

COPY
RECEIVED FOR FILING

APR 29 2005

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## COMPLAINT

Plaintiffs, Louis R. Capece, Jr., George Capece, Sr. and George Capece,

Jr., by and through their undersigned attorneys, sue the Defendants, The

Depository Trust and Clearing Corporation ("DTCC") and its subsidiaries, The

Depository Trust Company ("Depository Trust") and The National Securities

Clearing Corporation ("NSCC"), and allege as follows:

1.      This is an action for damages in excess of $15,000.00.

2.      At all times material hereto, the Plaintiff, Louis R. Capece, Jr. was a

      resident of the State of Florida.

3.      At all times material hereto, the Plaintiff, George Capece, Sr. was a

      resident of the State of New York.

l

4.   At all times material hereto, the Plaintiff, George Capece, Jr. was a resident of the State of New York.

5.   At all times material hereto, the Defendant, DTCC, is a New York corporation with its principle place of business at 55 Water Street, New York, New York 10041-0099.

6.   At all times material hereto, the Defendant, NSCC, is a New York corporation with its principle place of business at 55 Water Street, New York, New York 10041-0099.

7.   At all times material hereto, the Defendant, Depository Trust, is a limited purpose trust company formed under the banking laws of New York. It also maintains a principle place of business at 55 Water Street, New York, New York 10041-0099.

8.   The Defendants provide their services to Florida corporations and residents. The actions of the Defendants as alleged herein are sufficient to confer jurisdiction over these Defendants pursuant to Section 48.193, Florida Statutes.

9.   Louis Capece was the previous owner of 100% of the stock in Air Response Air Ambulance, Inc. ("Air Response"), a New York corporation, incorporated in 1986. Air Response began as an air ambulance transport company which served three counties in up-state New York. From 1986 – 1999 the business expanded significantly to include a fleet of 12 aircraft and approximately 35 ground vehicles. In 1999, Air Response had gross revenues of $25,000,000.00.

10.   On or about April 8th, 1999, Louis Capece sold Air Response to Cyber-
Care, Inc., a Florida corporation, with its principle place of business in
Boynton Beach, Florida. By the terms of the sale, Capece exchanged his
shares of stock in Air Response, valued at $5,000,000.00 for 3,100,000
shares of stock in Cyber-Care, Inc. As a result of the equity that Air
Response had in its aircraft, the exchange for shares of Air Response
stock increased the net asset value of Cyber-Care, Inc. Pursuant to the
contract terms, Louis Capece was restricted from selling any of his Cyber-
Care shares for a period of one year. On April 10th, 2000, the first day the
restrictions on Louis Capece's stock could have been lifted, the share
price of Cyber-Care, Inc., which traded under the symbol "CYBR," opened
at $15.06. At that point the value of Louis Capece's stock was
$46,686,000.00.

11.   Cyber-Care, Inc., a health management company, developed the
electronic house call system, known as Patent Internet Based Technology
Systems, that provides remote monitoring of individuals for health care
purposes. Additionally, at all times material hereto, Cyber-Care, Inc.
operated physical, occupational and speech therapy centers, E-Pharmacy
and one of the world's largest ambulance transport services.

12.   Louis Capece has sold 2,400,000 CYBR shares to date. The total amount
of money Capece received from his sale of 2,400,000 shares was
approximately $600,000.00, an average sales price of .25. Louis Capece
currently holds 700,000 CYBR shares.

3

13. Beginning on 06/15/99 and continuing through 03/08/02, George Capece.. Sr. purchased a total of 6300 shares of CYBR which he continues to hold until this day.

14. Between 03/22/2000 and 07/25/2000, George Capece, Jr. purchased a total of 1600 shares of CYBR in the amount of $22,237.38 which he continues to hold to this day.

15. During all times material hereto, CYBR stock was actively traded and the trades were cleared and settled by the Defendants.

16. DTCC is a holding company which consists of four subsidiaries (one depository and three clearing corporations): The Depository Trust, the NSCC, the Fixed Income Clearing Corporation and the Emerging Markets Clearing Corporation.

17. DTCC through its subsidiaries, provides clearance, settlement and information services for equities, corporate and municipal bonds, government and mortgage backed securities, over-the-counter credit derivatives and emerging market debt trades.

18. In 2003 the value of securities cleared and settled through the DTCC was stated to be 923.4 trillion dollars. The DTCC's total revenue for 2003 was stated to be $947,000,000.

19. The DTCC, through its subsidiaries, provides its services to Florida corporations and residents.

4

20.   Depository Trust is a subsidiary of the DTCC.  It is the world's largest securities depository and a clearing house for settlement of securities and trading activity.

21.   Depository Trust was formed approximately 30 years ago to eliminate the physical movement of securities among brokerage firms on Wall Street and to help satisfy delivery requirements.

22.   Financial organizations deliver securities on behalf of their customers through computerized bookkeeping records (also known as book entry deliveries) at the Depository Trust without ever physically transferring the securities.  In 2003, the value of book-entry deliveries processed by the Depository Trust was stated to be 105.7 trillion dollars.

23.   Depository Trust records the transfer of securities by book-entry by debiting the transferor's depository trust account and crediting the transferree's depository trust account.

24.   Depository Trust also retains physical custody of stock certificates on behalf of its members.  Stock certificates for registered securities deposited with the Depository Trust are held in the name of Cede & Company, Depository Trust's Nominee Name.  As of December 31st, 2003, the value of securities at the Depository Trust was stated to be 24.6 trillion dollars and the number of depository eligible securities was stated to be 2,227,000.

25.   The Depository Trust provides its services to Florida corporations and residences.

5

26.    NSCC was created in 1976 as a result of the merger of three major
       clearing corporations. (NYSE, ANEX and NSDA). In 2003, the total
       number of transactions processed by the NSCC was stated to be 4.7
       billion with the value of 81.2 trillion dollars.

27.    NSCC, in connection with the Depository Trust, provides centralized
       clearance, settlement and information services for virtually all broker-to-
       broker equity, corporate bond, municipal bond, exchanged-traded funds
       and unit investment trust trades that occur in the United States.

28.    Upon information and belief, the NSCC provides its services to Florida
       corporations and residents.

29.    Transactions processed by the NSCC clear and settle through the
       Continuous Net Settlement System ("CNS System"). Sellers and buyers
       who clear and settle through the CNS System are required to be members
       of the NSCC and the Depository Trust ("Members").

30.    NSCC guarantees completion of the transactions it processes through the
       CNS System by assuming (i) the obligation of the buyers to make
       payment to the sellers upon delivery of the shares, and (ii) the obligation
       of the sellers to deliver shares to the buyers.

31.    Each day during the daytime allocation cycle, the CNS system continually
       nets all trades to its members by security to net long (purchase) and net
       short (sale) positions which are then further netted with closing positions
       carried forward from the previous trading day. The resulting net positions
       represent the quantity of each security due for settlement by the Members.

A long position represents a quantity owed to the Members by the NSCC and a short position represents the quantity owed to the NSCC by the Members. After determination of a Member's long and short position at the end of the daytime allocation cycle, the positions are passed to the Depository Trust for processing over the evening allocation cycle.

32.   The short positions are compared to the Member's Depository Trust Account to determine if the number of shares on deposit is sufficient to settle the short positions. If so, the shares are transferred from the member's depository trust account to the NSCC's depository trust account. Shares received from members in settlement of short positions are placed in the NSCC's depository trust account awaiting instructions from NSCC for delivery to the Depository Trust Accounts of members in long positions.

33.   Based on instructions from the NSCC, as shares are received by the NSCC from members with short positions, they are automatically allocated from the NSCC's Depository Trust accounts to the Depository Trust accounts of members with long positions.

34.   Early morning on the next business day, after regular evening allocation processing, the NSCC determines which open short positions are high priority obligations. The NSCC then attempts to borrow shares through the Stock Borrow Program to satisfy these open positions.

35.   The Stock Borrow Program allows the NSCC to borrow available stocks from participating members to cover short positions that remain open after

7

a day's trade.  The short positions are created by priority requests for

allocation, by-ins submitted by members, the need to deliver against

omnibus positions with other clearing corporations and by sellers' fails to

deliver.

36.    As provided in Addendum C1 of the Rules and Procedures of the National

Securities Clearing Corporation (effective December 26th, 2003), the

process of the Stock Borrow Program is as follows:  (a) on a daily basis,

Members who wish to participate in the Stock Borrow Program inform

NSCC of the number of shares of each security that are available to be

borrowed and their general unpledged account at the Depository Trust; (b)

each morning after the evening allocation cycle, the NSCC determines

which short positions still remain open; (c) if a short position remains

open, the NSCC attempts to borrow securities from its Members to satisfy

these open positions; (d) the NSCC uses a formula to determine the order

in which it will borrow securities from its Members and utilizes the full

amount of shares available from one Member before borrowing from the

next Member in sequence; (e) when the shares are borrowed, the lending

Member's Depository Trust Account is debited by the number of borrowed

shares.  The borrowed shares are then credited to the NSCC's Depository

Trust Account and transferred to the buyer's Depository Trust Account.

The buyer acquires all right, title and interest in the borrowed shares,

including the right to vote, receive dividends and resell the shares, without

encumbrance or any reservation of rights; (f) the NSCC records the

8

borrowing of the shares as a long position in a special CNS sub-account
set up specifically for the lending Members stock borrow activity; (g) the
NSCC credits the lending Member's regular CNS account with funds
equivalent to the total current market value of the borrowed shares which
the lending Member may invest to earn interest overnight; (h) the NSCC
also receives a fee from the Member who created the short position
requiring the NSCC to borrow the shares through the Stock Borrow
Program.

37.   Shares borrowed by the NSCC are only returned when regular short
deliveries from sellers for that day exceed priority needs in a particular
security.

38.   Through normal allocation to the CNS sub-account of the lending
Members, borrowed shares which are returned are allocated to the
lending Members' account at current market prices and the returned
shares are transferred from the NSCC's Depository Trust Account to the
lending Member's Depository Trust Account. The NSCC distributes
reports to the lending Members each morning, reflecting stock borrow
activity.

39.   Membership in both the NSCC and Depository Trust is required in order to
be a lender in the Stock Borrow Program. Lenders are selected based on
a certain formula. Each day the lending Members are assigned a random
allocation number for each security made available. A factor is developed
from each lending Member by dividing a percentage of each lending

9

Member's average loans as they relate to total NSCC borrowings by the percentage of each lending Member's average fees paid for trade comparison, trade reporting and clearance as they relate to the total fees for all Members. Each random allocation number is then multiplied by the factor to produce an adjusted random number per position for each lending Member. The lending Member with the lowest number will receive the first priority for borrowing.

40.     One of the effects of the Stock Borrow Program is to allow sellers to continue to fail to deliver because the NSCC can borrow shares from the Stock Borrow Program to cover the fail to deliver positions.

41.     If the Seller fails to deliver the sold shares on Settlement Day, a short position for that Seller is created by the CNS system which is ultimately covered by the Stock Borrow Program either directly through the NSCC's daily allocation cycle or indirectly through a buy-in executed with shares borrowed through the Stock Borrow Program.

42.     In the case of a buy-in as set forth in the Rules and Procedures of the National Security Clearing Corporation (effective December 26th, 2003), when a Seller fails to deliver, the Buyer notifies the NSCC that it intends to buy-in the Seller's fail to deliver position. However, instead of executing the buy-in by going into the market, the NSCC executes the buy-in by borrowing shares from lending Members of the Stock Borrow Program.

43.     As a result, the Stock Borrow Program allows Sellers to continue to fail to deliver because the Stock Borrow Program has effectively obviated the

Seller's obligation to deliver and the Buyers' right to buy-in through the market.

44.     By borrowing shares through the Stock Borrow Program to cover fails to deliver the Defendants have created tens of millions of unregistered illegal free trading shares of the issuant artificially (1) increasing the supply of an issuer's shares in the market place, (2) driving down the price of the stock of the issuer; (3) devaluating the shareholder's holdings in an issuer's stock; and (4) causing multiple owners to purchase shares in separate transactions to essentially own the same shares.

45.     The profits from recycling borrowed shares amounts to stock-kiting in that the same borrowed shares can continuously be transferred from a buyer and loaned to the NSCC for delivery to the next buyer who then loans the same shares to the NSCC and so forth.  Thus, the same shares can be recycled repeatedly through the Stock Borrow Program to satisfy multiple delivery requirements.

46.     The Stock Borrow Program allows the borrowed shares to be recycled repeatedly, resulting in the number of borrowed shares exceeding the number of shares issued and authorized by the issuer.  In addition, upon information and belief, the number of borrowed shares exceeds the total number of issuer's shares actually at the Depository Trust.  Thus, upon information and belief, the Depository Trust owns and holds a significantly fewer number of lendable shares than the NSCC has borrowed through the Stock Borrow Program.

47.    There is little incentive for the Defendants to force Sellers to cure fail to deliver positions once the loan has been made because the Stock Borrow Program has become a reliable source of income for the Defendants. For the year end of December 31st, 2003, the Depository Trust reported revenues from services of $425,416,000.00 and the NSCC reported revenues from services of $293,133,000.00. In addition, open failed to deliver positions present a potential risk of loss to the Defendants because the NSCC covers these positions by borrowing shares through the Stock Borrow Program. At the close of business on December 31st, 2003, the value of securities borrowed through the Stock Borrow Program was stated to be approximately $721,750,000.00. As a result, the NSCC, as Borrower, has subjected itself to the possibility of significant financial losses if the Seller is ultimately unable to honor its delivery obligations to the NSCC.

48.    Through the Stock Borrow Program, the Defendants have permitted Sellers to maintain fail to deliver positions of millions of shares for periods of a year and even longer. This course of conduct by the Defendant has had the effect of creating tens of millions of additional unregistered illegal free trading shares of the issuer, artificially increasing the supply of shares in the market place and driving down and manipulating the stock of numerous issuers, including Cyber-Care, Inc.

12

49.    The Defendants knew or should have known of the problems with the Stock Borrow Program referred to in paragraphs 40-48 above prior to 1999 and prior to the causes of action set forth herein.

50.    Beginning in late 1999, a number of significant investors established and/or held "naked short" positions in the CYBR stock.

51.    Based on CYBR's transfer records together with the records of the Depository Trust Corporation and its subsidiaries, the respective CYBR stock positions were misrepresented to the financial community and shareholders of CYBR in that the failure of the Defendants to properly monitor its Stock Borrow Program led to a dramatic increase in unregistered CYBR shares.  The problems created by the failure of the Defendants to properly monitor its Stock Borrow Program has been compounded by the Defendants' assurances to the investment community that it was properly monitoring its Stock Borrow Program

52.    "Short sales" are "naked" when the parties initiating the sales do not own or control, nor have they, nor can they, borrow sufficient shares of the stock to cover their "short positions, " as required by law, thus resulting in a failure to deliver CYBR securities, as required by law.

53.    During the years from 1999-2004, repeated "naked short sales" of CYBR stock eventually destroyed the integrity of the trading market of CYBR stock because it allowed considerably more shares to trade than were ever issued in the history of CYBR.

54.   The result was that an artificial and false trading system in CYBR shares
was created and allowed an unlimited number of CYBR shares to be sold
short, thus artificially diluting CYBR shareholder rights and interest (such
as voting and dividend rights, including the rights and interests of plaintiffs
(b) devaluing the CYBR shares held by the Plaintiff at an artificial rapid
rate in the market place and (c) manipulating CYBR market share prices
downward in what has been characterized as a "debt spiral;" and (d)
making it virtually impossible for Cyber-Care's management to combat the
short seller.

55.   The shares held by Louis Capece were eligible to become unrestricted as
of April 10th, 2000.  On that date, CYBR shares opened at a price of
$15.06, making Louis Capece's share in CYBR worth approximately
$46,686,000.00.

56.   The trading in CYBR was particularly volatile during the time between
December of 1999 and April of 2000.  From December 1st, 1999 through
the closing on February 22nd, 1999, the share price of CYBR went from
$4.00 a share to $37.63 a share, an increase of over 840%.  By April 10th,
2000, the share price of CYBR had retreated over 60% to where in
opened at $15.06.

57.   Beginning in mid to late December of 1999, the number of short positions
in CYBR began to increase, no doubt as a result of the rapid increase in
the share price of CYBR.  These short positions steadily increased during
the first few months of 2000.

58.  As of April 10th, 2000, Louis Capece owned approximately 3% - 5% of the float in CYBR.  At the time his shares were eligible to become unrestricted, management of CYBR was aware of the increasing short position in CYBR.

59.  During the first few months of 2000, positive analyst reports were continuing to be generated on CYBR with projected share prices in the $50.00 - $52.00 range.  As of April 10th, 2000, insiders controlled approximately 40% of the CYBR float.  Many of these insider shares were not eligible to be shorted because they were either restricted, held in non-margin accounts or were otherwise not eligible for shorting.

60.  Therefore, as of April 10th, 2000 it was reasonable for the Plaintiffs to assume that the supply of shares of CYBR available to be shorted was about to be exhausted.  In these situations, a "short squeeze" is often created leading to a rapid increase in the stock price.

61.  Accordingly, the Plaintiffs did not elect to sell their shares in April of 2000 or shortly thereafter.

62.  The Plaintiffs were unaware of the Defendants' failure to properly monitor its Stock Borrow Program which had the effect of allowing virtually unlimited shares of CYBR to be shorted.  In essence, the failure of the Defendants to properly monitor the Stock Borrow Program led to a situation where there was an inexhaustible supply of CYBR shares to be shorted.  This had the effect of artificially deflating CYBR's stock price and making it essentially impossible for management to combat the "short raid"

15

eventually causing  CYBR to fall into a "death spiral," both in terms of its share price and its underlying business.

63.    Had the Plaintiffs known the true facts concerning the effects of the Defendants' failure to monitor the Stock Borrow Program, the Plaintiffs would have begun to devest themselves of their CYBR shares in an expedient fashion.

COUNT I - NEGLIGENCE

64.    The Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 – 63 above as if fully set forth herein.

65.    The Defendants owed a duty to the Plaintiffs and all of the investment community to properly monitor their Stock Borrow Program.

66.    The Defendants were negligent with respect to said duty in the following ways:

(a)  the Defendants have misrepresented to the Plaintiffs and the investment community that the Stock Borrow Program is a "loan" of shares from participating Members of the Stock Borrow Program to cover failed to deliver positions in the clearing and settlement process;

(b)  the Defendants have failed to exercise reasonable care and competence in communicating to Plaintiffs and others in the investment community that the NSCC is borrowing shares from lending Members through the Stock Borrow Program to cover fail to deliver positions in the clearing and settlement process, when, in fact, the transfer of shares from lending Members to the NSCC to cover such failed to deliver positions is

actually a "sale" of securities.  This transaction is a sale because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares including the right to vote, receive dividends and resale the shares, without further encumbrance or any reservation of rights;

(c )    the Defendants have failed to exercise reasonable care or confidence in communicating to Plaintiffs that they have sufficiently cleared and settled trades.  In fact, the Defendants are not clearing and settling those trades which result in open failed to deliver positions, because these trades are processed through the Stock Borrow Program and remain unsettled for extended periods of time.

(d )    by communicating to Plaintiffs and others in the investment community the following representations on the Defendants' annual statements, websites and various press releases:  (a) that through the CNS system, it maintains an orderly flow of security and money balances; (b) that through the Stock Borrow Program Members lend NSCC stock from their accounts at the Depository Trust to cover temporary short falls in the CNS system; and (c) that securities loaned to the NSCC through the Stock Borrow Program enable the NSCC to satisfy CNS delivery obligations not filled through normal deliveries.

(e )    by failing to take action even after the Defendants have been aware that Sellers routinely fail to deliver securities on settlement day and that unfulfilled obligations to deliver securities can have a negative effect

on the market for a security when fails to deliver persist for extended period of time.

(f) by failing to take corrective action once the Defendants became aware or should have become aware that open failed to deliver positions covered by shares borrowed through the Stock Borrow Program actually increase the supply of shares in the market place by the number of shares borrowed, resulting in the artificial inflation of the issued and outstanding shares of the issuer to the detriment of those buying and holding the shares of the issuer.

(g) the Defendants were further negligent by utilizing the Stock Borrow Program to cover open failed to deliver positions in CYBR stock which inconsequently created an artificial number of CYBR shares, thereby negligently misrepresented to Plaintiffs that these artificial shares were issued and outstanding when in fact they had not been issued or authorized by CYBR.

67. As a result of the negligence alleged herein, the Plaintiffs have been damaged in that the value of their holdings in CYBR were significantly reduced by the aforementioned effects of the failure to monitor the Stock Borrow Program. Moreover the Plaintiffs would have divested themelves of their CYBR holdings as soon as possible had they known the true facts concerning how the Defendants were choosing to monitor the Stock Borrow Program.

WHEREFORE, the Plaintiffs, Louis R. Capece, Jr., George Capece, Sr. and George Capece, Jr.,demand judgment against the Defendants, The Depository Trust and Clearing Corporation ("DTCC") and its subsidiaries, The Depository Trust Company ("Depository Trust") and The National Securities Clearing Corporation ("NSCC"), for damages, taxable costs, and any other relief the court deems proper and further demand trial by jury.

ALAN C. ESPY
Attorney for Plaintiff
3300 PGA Boulevard, Suite 630
Palm Beach Gardens, FL 33410
Telephone: 1/561/627-4775
Telefax: 1/561/627-4802
Florida Bar No. 375187

# Exhibit 2

FILED

APR 2 8 2005

RONALD A. LONGTIN, JR., CLERK

By: _____
DEPUTY

CODE: 3370

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

NANOPIERCE TECHNOLOGIES, INC., et al.                Case No.  CV04-01079

                              Plaintiff,

v.                                                   Dept. No.  6

THE DEPOSITORY TRUST AND CLEARING
CORPORATION, et al.

                              Defendants.
_____/

ORDER

The court has read and considered the legal memorandum submitted in support of and

opposition to Defendant's *Motion to Dismiss the Complaint* filed on July 301, 2004 and re-submitted

March 4, 2005 as well as the oral arguments presented on February 16, 2005.

The dispute arises over the practice of clearing and settling securities through the Defendant

institutions.  Defendants are New York-based clearing and depository institutions explicitly

authorized by the Securities and Exchange Commission (herein "SEC").[1]  Plaintiffs claim that

Defendants' federally authorized clearing and settlement services, specifically the Stock Borrow

Program (herein "SBP"), devalued Plaintiff Nanopierce's stock.  Plaintiffs contend that SBP

---

[1] The Depository Trust and Clearing Corporation (herein "DTCC") operates as a holding company, which consists of four subsidiaries: the Depository Trust Corporation (herein "DTC"), the National Securities Clearing Corporation (herein "NSCC"), the Fixed Income Clearing Corporation, and the Emerging Markets Clearing Corporation.  The DTC is the nation's largest securities depository and clearinghouse for settlement of securities trading activity.  The NSCC is a New York corporation that provides centralized clearance, settlement, and information services for virtually all broker-to-broker equity, corporate bond, municipal bond, exchange-traded funds and unit investment trades.

-1-

authorizes and facilitates naked short selling by market participants.[2]  Defendants bring this motion to dismiss pursuant to NRCP 12(b)(5) arguing that Plaintiffs' claims fail because they are barred under the preemption doctrine.[3]

Motion to Dismiss

In considering a dismissal under NRCP 12(b)(5), the Court must construe the pleadings liberally and draw every fair inference in favor of the non-moving party.  *Simpson v. Mars Inc.*, 113 Nev. 188, 929 P.2d 966 (1997).  A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot prove any set of facts, which, if accepted by the jury, would entitle it to relief.  *Id.* at 191.  Nevada has a strong policy favoring the resolution of disputes on the merits.  *Yochum v. Davis*, 98 Nev. 484, 487, 653 P.2d 1215 (1982).

Defendants assert that Plaintiffs' causes of action should fail because the field has been so thoroughly occupied by federal law as to preempt state regulation of the federally authorized practices which are the subject of the complaint in this action.  Whether a state law is preempted is a matter of congressional intent.  If Congress intended to exercise its constitutional authority to supersede the laws of a state, the Supremacy Clause of the Constitution of the United States requires courts to follow federal law.  *Levintin v. PaineWebber, Inc.*, 159 F.3d 698, 705 (1998).  If the federal law does not contain explicit language regarding preemption, courts must consider whether the federal statute's structure and purpose, or nonspecific statutory language, reveal a clear, implicit preemptive intent.  *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 116 S.Ct. 1103 (1996).  Preemptive intent may be inferred when "the federal statute created a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it.'"  *Levintin*, 159 F.3d at 705 (quoting *Barnett Bank*, 517 U.S. at 31, 116 S.Ct. 1103).

Federal regulation of the securities industry, especially the clearing and depository institutions, is extensive.  In 1975, Congress amended the Securities Exchange Act of 1934 by

---

[2] The SBP, operated by NSCC, assists in settling transactions from which a delivery obligation remains open.  Under the SBP, NSCC borrows members' shares of stock which are voluntarily loaned for the purpose of settling transactions where participants have not made sufficient shares available to satisfy delivery obligations.  The SEC has explicitly approved the program.
[3] Although Defendants also assert that Plaintiffs' claims should fail on other grounds, the Court only addresses the preemption argument.

adding Section 17A.  This amendment vested the United States Securities and Exchange Commission (herein "SEC") with the centralized decision-making authority and responsibility to oversee and regulate a uniform national market system for securities transactions.  15 U.S.C. 78q-1(a)(2)(A)(i).  Accordingly, Congress granted the SEC explicit authority to regulate clearing agencies like DTC and NSCC and to approve the regulations governing these agencies.  15 U.S.C. § 78q-1.  The SBP is a component of NSCC's rules and was expressly approved by the SEC.  SEC Release No. 34-17422, 46 Fed. Reg. 3104 (January 7, 1981).

As stated above, the SBP, which forms the basis of Plaintiffs' complaint, operates to assist NSCC in settling transactions for which a delivery obligation from the seller of securities of remains open.  SEC Release No. 34-18027; 46 Fed. Reg. 41892 (August 18, 1981).  The SBP operates in an automated fashion without the exercise of discretion by NSCC as to whether any particular open transaction should be covered by SBP.  *National Securities Clearing Corp. Rules, Addendum C.* Each member of NSCC elects to participate in the SBP and permits its eligible stock to be made available for borrowing through the SBP program.  *Id.*  Therefore, if positions remain open and shares are voluntarily made available by members to fill such positions, the system will automatically fill the positions.  SEC Release No 37-18027; 46 Fed. Reg. 41892 (August 18, 1981). If a member does not wish to make shares available, NSCC has no power to compel them to do so. *Id.*

As illustrated above, the federal government extensively regulates the securities industry. The SBP is an automated, non-discretionary process specifically approved by the SEC as a component of the nationwide stock transactions' clearing system.  Therefore, the Court finds that federal law preempts Plaintiffs' claims for relief.  Federal law explicitly permits the SBP to operate. Plaintiffs have not alleged that the NSCC violated any rules governing SBP.  Therefore, state law may not be applied as to impose damages on Defendants.  To do this would be to forbid the Defendants from doing what the SEC authorized them to do.

///

///

///

1    Accordingly, and with good cause appearing, Defendants' *Motion to Dismiss the Complaint*

2  is GRANTED.

3

4    DATED: This _27th_ day of _April_, 2005.

5

6

7                            DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

1

## CERTIFICATE OF SERVICE BY MAILING

2       Pursuant to NRCP 5(b), I hereby certify that I am an employee of the Second Judicial

3   District Court, in and for the County of Washoe; and that on this _____ day of April,

4   2005, I deposited in the County mailing system for postage and mailing with the United

5   States Postal Service in Reno, Nevada, a true and correct copy of the attached document

6   addressed as follows:

7   Dan Bowen, Esq.
    Lionel, Sawyer & Collins
8   50 W. Liberty Street, #1100
    Reno, Nevada  89501

9

    Michael J. Morrison, Esq.
10  1495 Ridgeview Drive, #220
    Reno, Nevada  89509

11

    Bruce R. Laxalt, Esq.
12  Laxalt & Nomura, Ltd.
    50 West Liberty Street, Ste. 700
13  Reno, Nevada  89501

14  Gregg M. Mashberg, Esq.
    Karen D. Coombs
15  Aliza Ross
    1585 Broadway
16  New York, NY  10036

17  William E. Cooper, Esq.
    601 E. Bridger Avenue
18  Las Vegas, NV  89101

19

20  _____
    Heidi Boe
21      Administrative Assistant

22

23

24

25

26

27

28

# Exhibit 3

IN THE UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
_____ DIVISION

LOUIS R. CAPECE, JR.,                          CASE NO.: 04-80403

        Plaintiff,                             CIV-RYSKAMP

                                               MAGISTRATE JUDGE VITUNAC

v.

ANTHONY ELGINDY, ELGINDY SITES, ROBERT HANSEN
ELGINDY ACCOMPLICES, JOHN DOES 1through 50, JOHN
DOES, INC.1through 50, DEPOSITORY TRUST AND CLEARING
CORPORATION, a New York corporation, DEPOSITORY
TRUST COMPANY, A New York Limited Purpose Trust
Company, BROKER DOES 1 through 40, BROKER DEALER
DOES 1 through 40, BRADLEY ABELOW, MICHAEL C.
BODSON, JONATHAN E. BEYMAN, FRANK J. BISIGNANO,
STEPHEN P. CASPER, JILL M. CONSIDINE, PAUL F.
COSTELLO, JOHN W. CUMMINGS, DONALD F. DONAHUE,
MARY M. FENOGLIO, GEORGE HRABOVSHY,
RONALD J. KESSLER, CATHERINE KINNEY,
PETER B. MADOFF, EILEEN K. MURRAY, JAMES P.
PALERMO, THOMAS J. PERNA, RONALD PURPORA,
DOUGLAS SHULMAN, ROBERT H. SILVER, DENNIS J.
DIRKS, and THOMPSON M. SWAYNE, KNIGHT SECURITIES LLP,
SCHWAB CAPITAL MARKETS, SPEER, LEEDS AND KELLOG,
M.H. MYERSON, AMERITRADE, MORGAN STANLEY,
GLOBAL SECURITIES (CANADA), E-TRADE, FIERO BROTHERS,
TD-WATERHOUSE, JEFFRIES & CO, BEAR STEARNS,
FLORIDA DISCOUNT BROKERS, PACIFIC SECURITIES (CANADA),
FLEET TRADING, INSTINET CORPORATION, GRUNTAL & CO.,
ARCHIPELAGO LLC, ING BARINGS FURMAN SELZ,
DREYFUS, FIRST BERMUDA, DLJ, DATEK, SHERWOOD SECURITIES,

        Defendants.

_____/

**SUMMONS IN A CIVIL CASE**

TO DEFENDANT:

**DEPOSITORY TRUST COMPANY**
**By Serving**
**55 Water Street, 49th Floor**
**New York, NY 10041**


**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S
ATTORNEY

ROBERT C. STONE, ESQUIRE
LAW OFFICE OF ROBERT C. STONE, P.A.
555 South Federal Highway, Suite 450
Boca Raton, Florida 33432

an answer to the complaint which is herewith served upon you, within twenty (20) days
after service of this summons upon you, exclusive of the day of service.  If you fail to do
so, judgment by default will be taken against you for the relief demanded in the
complaint.   You must also file your answer with the Clerk of this Court within a
reasonable period of time after service.

DATED on May /2—, 2004.

CLARENCE MADDOX
Clerk of the Court

By:_____
As Deputy Clerk

IN THE UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
_____ DIVISION

# 04-80403

LOUIS R. CAPECE, JR.,

           Plaintiff,

CASE NO.:

## CIV-RYSKAMP

v.

### MAGISTRATE JUDGE
~~VITUNAC~~

ANTHONY ELGINDY, ELGINDY SITES, ROBERT HANSEN
ELGINDY ACCOMPLICES, JOHN DOES 1through 40, JOHN
DOES, INC.1through 40, DEPOSITORY TRUST AND CLEARING
CORPORATION, a New York corporation, DEPOSITORY
TRUST COMPANY, A New York Limited Purpose Trust
Company, BROKER DOES 1 through 40, BROKER DEALER
DOES 1 through 40, BRADLEY ABELOW, MICHAEL C.
BODSON, JONATHAN E. BEYMAN, FRANK J. BISIGNANO,
STEPHEN P. CASPER, JILL M. CONSIDINE, PAUL F.
COSTELLO, JOHN W. CUMMINGS, DONALD F. DONAHUE,
MARY M. FENOGLIO, GEORGE HRABOVSHY,
RONALD J. KESSLER, CATHERINE KINNEY,
PETER B. MADOFF, EILEEN K. MURRAY, JAMES P.
PALERMO, THOMAS J. PERNA, RONALD PURPORA,
DOUGLAS SHULMAN, ROBERT H. SILVER, DENNIS J.
DIRKS, and THOMPSON M. SWAYNE, KNIGHT SECURITIES LLP,
SCHWAB CAPITAL MARKETS, SPEER, LEEDS AND KELLOG,
M.H. MYERSON, AMERITRADE, MORGAN STANLEY,
GLOBAL SECURITIES (CANADA), E-TRADE, FIERO BROTHERS,
TD-WATERHOUSE, JEFFRIES & CO, BEAR STEARNS,
FLORIDA DISCOUNT BROKERS, PACIFIC SECURITIES (CANADA),
FLEET TRADING, INSTINET CORPORATION, GRUNTAL & CO.,
ARCHIPELAGO LLC, ING BARINGS FURMAN SELZ,
DREYFUS, FIRST BERMUDA, DLJ, DATEK, SHERWOOD SECURITIES,

           Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, LOUIS R. CAPECE, JR., by and through his undersigned attorney, hereby files

his Complaint and demand for a jury trial against Defendants and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, based upon federal questions concerning laws of the United States; in particular, the Securities Exchange Act of 1933, 15 U.S.C. § 77 (the "1933 Act") and the Securities Exchange Act of 1934, 15 U.S.C. § 78 (the "1934 Act"), and further, on the principle of pendent jurisdiction.

2.      Jurisdiction of this cause is founded on Section 1964 of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), Florida RICO, §895.02 Fla. Stat. (2003) and state common law.

3.      Jurisdiction is also founded on 18 U.S.C. § 121 as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

4.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because this is the judicial district in which a substantial part of the events giving rise to the Plaintiff's claim occurred.

5.      Venue is also proper pursuant to 18 U.S.C. § 1965.

## GENERAL ALLEGATIONS

6.      Plaintiff, LOUIS R. CAPECE, JR. ("CAPECE") is a resident of the State of Florida.

7.      Defendant, ANTHONY ELGINDY ("ELGINDY") is a resident of the State of California, and conducted business in the State of Florida.

8.      Defendant, ELGINDY SITES are private internet sites maintained by ELGINDY. Upon information and belief, ELGINDY is directly or indirectly the owner of these sites, and the precise nature and extent of such ownership and locations of these sites will be identified and this Complaint amended accordingly.

9.     Upon information and belief, Defendants ELGINDY ACCOMPLICES are employees and/or agents of ELGINDY, whose exact identities are unknown at this time, but will be identified and this Complaint amended accordingly.

10.    ROBERT HANSEN, Melbourne Florida, ran the website for ANTHONY ELGINDY from 1999 through June 2002, AnthonyPacific.com

11.    Defendants, JOHN DOES 1 through 40 are members of the ELGINDY SITES whose exact identities are unknown at this time, but will be identified and this Complaint amended accordingly.

12.    Defendants, BROKER DEALER, INC. DOES 1 through 40 and STOCK BROKER DOES 1through 20, whose exact identities and locations are unknown that this time, are the brokerage firms and brokers who acted for the JOHN DOES 1 through 40.  These Defendants' identities and locations will be identified and this Complaint amended accordingly.

13.    Defendants, JOHN DOES, INC. 1 through 40 are brokerage firms/broker dealer/market maker firms that effected the trades that were placed by the brokers, whose exact identities and locations are unknown at this time, but will be identified and this Complaint amended accordingly.

14.    Plaintiff does not know the true names or capacities of the Defendants sued herein as BROKER DOES 1 through 20, inclusive who are each individuals operating as a broker and trader in a foreign jurisdiction and who, at all times pertinent hereto, conducted business in the State of Florida.  BORKER DEALER DOES 1 through 40 are licensed by the National Association of Securities Dealers, Inc. and authorized to and did, in fact, trade the stock of Cybercare, Inc. Defendants KNIGHT SECURITIES LLP, SCHWAB CAPITAL MARKETS, SPEER, LEEDS AND KELLOG, M.H. MYERSON, AMERITRADE, MORGAN STANLEY,

3

GLOBAL SECURITIES (CANADA), E-TRADE, FIERO BROTHERS, TD-WATERHOUSE, JEFFRIES & CO, BEAR STEARNS, FLORIDA DISCOUNT BROKERS, PACIFIC SECURITIES (CANADA), FLEET TRADING, INSTINET CORPORATION, GRUNTAL & CO., ARCHIPELAGO LLC, ING BARINGS FURMAN SELZ, DREYFUS, FIRST BERMUDA, DLJ, DATEK, SHERWOOD SECURITIES, are licensed by the National Association of Securities Dealers, Inc. and authorized to and did, in fact, trade the stock of Cybercare, Inc. Upon information and belief, all of these Defendants were engaged in the illegal naked shorting activities and activities involving the failure to deliver securities of CYBR, as alleged herein below.

15.    At all times relevant hereto, Defendant DEPOSITORY TRUST AND CLEARING CORPORATION ("DTCC") was a New York corporation.

16.    Defendant, DEPOSITORY TRUST COMPANY ("DTC"), is a limited purpose trust company formed under the laws of New York, and is a self-regulatory organization. DTC is a wholly-owned subsidiary of DTCC. Defendant NATIONAL SECURITIES CLEARING CORPORATION ("NSCC") is a foreign corporation and a wholly-owned subsidiary of DTCC. Defendant FIXED INCOME CLEARING CORPORATION ("FICC") is a foreign corporation and a wholly-owned subsidiary of DTCC. DTCC, DTC, NSCC and FICC will be jointly referred to herein as "DTC". At all times relevant hereto, DTC was doing business in Florida.

17.    DTCC'S board is made up of 21 directors, who also serve as directors of the DTCC'S operating subsidiaries, DTC, NSCC and FICC, as set forth above. Seventeen directors represent DTC Participants, including international broker-dealers, correspondent and clearing banks, mutual fund companies and investment banks. Two directors are designated by DTCC'S preferred shareholders: NASD and the New York Stock Exchange. The remaining two directors are the chairman and chief operating officer of DTCC itself.

4

18.     Individuals are nominated for election as DTCC directors based on their ability to represent participants of each of DTCC'S operating subsidiaries, and Board committees are specifically structured to help achieve this objective.

19.     The DTCC directors, and one former director, named herein as Defendants and their securities industry affiliations, are: BRADLEY ABELOW, Managing Director, Goldman Sachs, (NYSE: GS); MICHAEL C. BODSON, Managing Director, Morgan Stanly (NYSE: MWD); JONATHAN E. BEYMAN, Chief Information Officer, Lehman Brothers (NYSE: LEH); FRANK J. BISIGNANO, Chief Administrative Officer and Senior Executive Vice President, Citigroup (NYSE: C), which is Solomon Smith Barney's Corporate Investment Bank; STEPHEN P. CASPER, Managing Director and Chief Operating Officer, Fischer Francis Trees & Watts, Inc.; JILL M. CONSIDINE, Chairman, President & Chief Executive Officer, The Depository Trust & Clearing Corporation (DTCC); PAUL F. COSTELLO, COO Wachovia Securities (NYSE: WB); JOHN W. CUMMINGS, Senior Vice President & Head of Global Technology & Services, Merrill Lynch & Co. (NYSE: MER); DONALD F. DONAHUE, Chief Operating Officer, The Depository Trust & Clearing Corporation (DTCC); MARY M. FENOGLIO, Executive Vice President, State Street Corporation (NYSE: STT); GEORGE HRABOVSHY, President, Alliance Global Investors Service; RONALD J. KESSLER, Vice Chairman, A.G. Edwards & Sons, Inc. (NYSE: AGE); CATHERINE KINNEY, President, Co-Chief Operating Officer and Executive Vice Chairman, new York Stock Exchange; PETER B. MADOFF, Senior Managing Director, Bernard L. Madoff Investment Securities; EILEEN K. MURRAY, managing Director and Global Head of Technology and Operations, Credit Suisse (NYSE: CSR) First Boston; JAMES P. PALERMO, Vice Chairman, Mellon Financial Corporation (NYSE: MEL); THOMAS J. PERNA, Senior Executive Vice President, Financial Companies Services Sector of The Bank if New York (NYSE: BK); RONALD PURPORA,

Chief Executive Officer, Garban LLC; DOUGLAS SHULMAN, President, Regulatory Services and Operations, NASD; ROBERT H. SILVER, Executive Vice President and President of Paine Webber Services, UBS (NYSE: UBS); Paine Webber Inc.; DENNIS J. DIRKS, former Director and Chief Operating Officer, DTCC, now retired; and THOMPSON M. SWAYNE, clearing agents, all dealing in the CBYR stock. These Defendants will be referred to herein as "DTC Director Defendants".

## SPECIFIC ALLEGATIONS

20.     CAPECE was the owner of 100% of the stock in Air Response Air Ambulance, Inc. ("Air Response"), a New York Corporation, incorporated in 1986. Air Response began as a ground and air ambulance transport company which served three counties in upper state New York. From 1986 to 1999 the business expanded, operating in Colorado, Florida, Kentucky and New York with a fleet of twelve aircraft and approximately 35 ground vehicles. In 1999 Air Reserve had gross revenues of $25,000,000.00.

21.     On or about April 8, 1999, CAPECE sold Air Reserve to Cybercare, Inc., a Florida Corporation, with its principal place of business in Boynton Beach, Florida. By the terms of the sale, CAPECE exchanged his shares of stock in Air Response, valued at $5,000,0000.00, for 3,100,000 shares of stock in Cybercare, Inc. As a result of the equity that Air Response had in its aircrafts, the exchange for shares of Air Response stock increased the net asset value of the Cybercare, Inc. Immediately after the share exchange, and a a direct and proximate result thereof, the market price for Cybercare, Inc. shares on the OTC Bulletin Board substantially rose in value. On April 8, 2000, the per share price in the open market reached approximately $15.80, making CAPECE'S share ownership value approximately $49,000,000.00.

22.     Cybercare, Inc., a health management company, developed the electronic house call system commonly patent internet base technology system that provides remote monitoring of individuals for healthcare purposes.     Additionally, Cybercare, Inc. operates physical, occupational and speech therapy centers, an e-pharmacy and one of the world's largest ambulance transport services.   At the time of the transaction Cybercare, Inc. had 39.1 million shares outstanding and had an average daily volume of 1,386,487 shares.

23.     The shares of Cybercare, Inc. stock of received by CAPECE were shares of stock which was restricted from being sold for one year, pursuant to Rule 144 of the Securities Act of 1933, as amended. CAPECE did not actually receive the stock certificate from Cybercare, Inc., until on or about September 7, 1999.

24.     At the time of the sale of Air Response to Cybercare, Inc., the publicly trading price of the Cybercare, Inc. stock was $15.00 per share.   However, CAPECE was prohibited from selling his shares because of the Rule 144 restrictions.

25.     On April 14, 2000, Cybercare, Inc. was approved for listing on the NASDAQ. Thereafter the Cybercare, Inc. stock began publicly trading on the NASDAQ national market as CYBR.  In calendar year 2000, Cybercare, Inc. obtained $31,000,000.00 in equity financing.  In return, it issued 500,000 common shares for $22.00 a share, along with a warrant to buy 100,000 shares at an exercise price of $31.00 a share.  At that time, a single investor bought the shares and the warrant.  On that date, two institutional investors bought shares that provided enough cash to start the market for the aforesaid electronic house call system, and the price of CYBR shares was $7.78 per share.

26.     The price of the Cybercare, Inc., stock continued to decline steadily from approximately $15.80 per share on April 8 2000, to approximately $.02 per share on April 8, 2004.

7

27.     CAPECE resigned from the Board of Cybercare, Inc. and was able to sell some of his shares. CAPECE sold approximately 2,400,000 shares and still holds 700,000 shares.  The total amount of money he received was $600,000 instead of the $ 49 million which was the true value of his share ownership.

28.     Each of the Defendants listed in paragraphs 7-18 has established, maintained, facilitated, and/or participated, directly or indirectly, in activities establishing and/or holding "naked short" positions in the CBYR stock and/or allowing each of the other Defendants to establish and/or hold "naked short" positions in the CBYR stock and/or fail to deliver securities of CYBR after a "naked short" transaction.  Stock transfer records of CBYR, together with the electronic records of Defendants, and especially DTC, establish the nature and extent of the "naked short" positions established and held by each of the Defendants, and the prices at which they which sold short, as well as their respective failures to deliver shares of CYBR, as required by law..

29.     Based on CBYR'S stock transfer records, together with the electronic records of Defendants, and especially DTC, and other market transaction records and information, the respective CBYR stock positions of Defendants, and their failures to deliver securities, as represented and/or omitted to disclose to Plaintiff and the financial community and shareholders of CBYR, constituted materially false and misleading information concerning the actual market and market transactions for the publicly traded securities of CBYR, in that Defendants, and other firms similarly situated (which changes from time to time), purport to own or control more free trading shares than are available in the market and/or failed to deliver securities, as required by law.  And, upon information and belief, these figures involving "naked shorts" and failures to deliver securities are increasing dramatically week by week.

30.     Defendants set forth in Paragraphs 11-13, as NASD licensees, owe a duty of care to Plaintiff to employ reasonable means and practices to ensure that trade transactions conducted on their own or on behalf of third parties are not being conducted for the purpose of, or which it is reasonable to foresee may or will have the result of improperly, deceptively or fraudulently (a) manipulating the market price of publicly traded CBYR shares, or (b) presenting false or misleading information concerning the price, actual trading activity and/or number of free-trading shares of CBYR outstanding and/or trading and/or failures to deliver securities. Pursuant to that duty, Defendants, and each of them, have to take reasonable steps to ensure that, when conducting "short sales", and that the securities which are subject of the particular trade can be delivered or borrowed by the settlement date and/or a specified date thereafter. In fact, Defendants, specifically including the DTC, which established, maintained and controlled the shares of stock, electronic records and trading of CYBR securities, including failed deliveries of CYBR securities, have all been involved in failed deliveries of securities, and have facilitated each of the other Defendants in its respective failure to deliver securities, all to the damage of Plaintiff.

31.     Defendants, and each of them, represented, and continue to represent to the public and Plaintiff, that the trades they conduct on their own or on behalf of third parties are *bona fide* transactions (a) which have been reasonably reviewed by them to ensure that the trading activity is not being conducted to improperly manipulate stock prices and/or (b) which present information to the investing public, financial community or Plaintiff accurately and truthfully portraying the status of stock transactions, ownership or control, and/or (c) accurately and truthfully portraying the amount of CBYR stock actually in the marketplace or owned by or under the control of Defendants, and/or are securities which have been delivered, as required by law.

32.     Defendants knew, or should have known that they did not own or control the securities represented to have been owned or controlled by them. respectively, and had no basis or reasonable belief that (a) they owned or controlled such securities, or (b) they had or could locate a source of CBYR shares to cover their "short" positions, or (c) the securities they each respectively sold short could or ever would be delivered.  The information Defendants provided to Plaintiff and others was materially false and misleading because Defendants were "short" the securities, did not own or control such securities, and had no reasonable, legal or legitimate source of shares to cover such "short" positions, and totally failed to ever deliver the subject securities.  Moreover, Defendants each knew, or should have known that they were individually unable to ever make delivery of the subject securities, as they neither owned the securities nor had a source from which to legitimately borrow such securities. Defendants are engaged in unlawful "shorting", also known in the market as "naked short sales", and/or "failure to deliver".

33.     Defendants, and each of them, represented that "short sale" transactions have been and will be settled by delivery or borrowing of securities by the settlement date or specified date thereafter.  Defendants knew, or should have known, that these representations, though false and misleading, would be relied upon by Plaintiff and others.

34.     Representations made by Defendants in paragraphs 27-32, above were made intentionally and/or negligently, and were materially false and misleading, in that:

(a)     Defendants did not deliver or borrow securities by the applicable settlement date or specified period thereafter in order to legally complete the "short sales" which they conducted in regard to securities of CBYR.

(b)     Defendants' "short" sales are "naked", in that Defendants do not and did not own or control, nor have they, nor can they borrow sufficient shares of CBYR stock to cover

10

the "short" positions they hold, as required by law, thus resulting in a failure to deliver the securities, as required by law.

(c)     Defendants have created false and misleading information in the financial marketplace as regards the total outstanding shares of CBYR that are free-trading and the total number of CBYR shares that trade in *bona fide* market transactions from day to day.

(d)     Defendants were "short" the securities, did not own or control such securities, and had no reasonable, legal or legitimate source of shares to cover such "short" positions, and knew they could never actually deliver the securities, as required by law.

(e)     The trades Defendants conducted or participated in on their own or on behalf of third parties were not *bona fide* transactions which had been reasonably reviewed by them to ensure that the trading activity was not being conducted to improperly manipulate stock prices and/or mislead the financial community, and especially, Plaintiff.

(f).     The trades Defendants conducted or participated in or on their own or on behalf of third parties were not *bona fide* transactions which presented true and accurate information to the investing public, or Plaintiff.

(g)     Defendants did not accurately and truthfully portray the status of stock transactions, ownership or control, the amount of CBYR stock actually in the marketplace or owned by or under the control of Defendants.

(h)     Defendants failed to disclose to the investing public, or to Plaintiff, the numbers of shares which were subject of failures to deliver securities as and when required by law.

35.     Defendants acted with *scienter*, in that they knew their actions and conduct was wrong and illegal, but they had a very obvious motive for their conduct, which was the profits they made from their "naked shorting" and "failure to deliver" activities, specifically including

the DTC, which made massive profits (upon information and belief, approximately US$220 MILLION in 2003) from their lending of CYBR shares to the other Defendants, and related services, without regard for the number of CYBR shares DTC had on deposit or was able to legally lend to the other Defendants.

36.     During years 2001, 2002, and continuing into 2003 and 2004, Defendants repeatedly conducted, and continue to conduct, "short sales" of CBYR stock without taking any measures to ensure that the stock could be delivered or borrowed by the settlement date and/or any other specified date (the "Naked Short Sales"). The "Naked Short Sales" destroyed the integrity of the trading market for CBYR stock because it allowed more shares to trade than were ever issued in the history of CBYR. The "excess" shares allow new purchasers, including Plaintiff, to enter the market, but the sellers of the shares, namely Defendants, do not deliver the shares they sold to such purchasers.

37.     The result is that Defendants create an artificial and false trading system, and information relating thereto, that allows an unlimited number of shares to be sold by Defendants, thus (a) artificially diluting shareholder interests, including the interests of Plaintiff, (b) devaluing the shares of Plaintiff in the marketplace and (c) manipulating market share prices. Defendants have created a totally fraudulent and misleading trading market in CBYR stock.

38.     Defendants failed and refused to take and reasonable measures of care with regard to their trading, clearing and/or transfer of shares of CBYR and breached their respective duties of care by, *inter alia:*

(a).     failing and refusing to implement reasonable and proper procedures and policies to prevent "Naked Short Sales",

(b).     failing and refusing to reasonably and properly monitor and supervise its employees and/or agents to ensure compliance with lawful prohibitions against "Naked Short Sales",

(c).     failing and refusing to implement and/or enforce and/or maintain reasonable and proper internal policies and procedures to monitor, detect and prohibit "Naked Short Sales",

(d).     failing and refusing to implement and/or enforce and/or maintain reasonable and proper accounting policies and procedures to monitor, detect and prohibit "Naked Short Sales",

(e).     failing and refusing to take any reasonable and proper action to monitor, detect and prohibit "Naked Short Sales", when they knew, or should have known, that "Naked Short Sales" were occurring and there was a trading pattern that involved innumerable failed deliveries of securities.

39.     Defendants, and each of them listed in Paragraphs 11-18, caused the publicly-traded float of the CBYR stock to be artificially inflated, thereby manipulating and/or controlling the price of CBYR stock in the public market.

40.     During year 2002, and continuing into 2003 and 2004, Defendants acted in concert with each other, and DOES 1-20, which are other securities industry professionals yet to be identified, to wrongfully engage in the activities described above, including the manipulation of the market price and perceived public float of the publicly-traded shares of CYBR.

41.     It has been recently discovered by the Plaintiff that Cybercare, Inc., stock has been manipulated through widespread patterns of violation of NASDAQ rules 3370 (prompt receipt and delivery of securities), thus violating the rules governing the time for settlement of short sales.

42.     Shares of Cybercare, Inc. are not on the "easy to borrow list" and, therefore, in the case of short sales by brokers and handling by broker dealers who are required to establish and

certify reliable source of share certificates as a condition precedent to executing the sale, Plaintiff

alleges that rule 3370 has been violated by numerous Defendants in regard to the settlement of a

short sale. The shares were not delivered within the three (3) days from the date of the

transactions, as required by the rules, and therefore, the price of the Cybercare, Inc. stock and the

value of Plaintiff's shares in Cybercare, Inc., were greatly diminished. It is alleged that the

broker dealers executed a short sale on behalf of a customer and did not deliver the share

certificates timely. The original owner of the shares that were certified as a supplier of the

certificates was also a customer who held Cybercare, Inc. shares in the street account on margin,

and DTC would have had to mark their shares as canceled, yet the customer's account with the

firm would indicate that it was still the owner of the share; therefore, the broker-dealer would

improperly include in the tally and report to ADP the number of shares their records reflected

still being in the respective customer's account. When ADP delivered its results of all the shares

claimed to be owned, it would be counting the shares that were reported for the lending

customer, that is, the "original, owner and putative lender of the certificates", as well as shares of

the buyer for the short-selling/borrowing customer. Each would be claiming, through ADP

records, to be the record holder of the same shares. These actions would artificially depress the

trading price of CYBR on NASDAQ, thus artificially and illegally manipulating the flow of the

shares in the marketplace.

 43.  ELGINDY, is a California businessman who had extensive experience as a stock

trader and offered and distributed advice to third parties, including Defendants identified in

paragraphs 8-13 above, regarding the "naked short" sales of CYBR shares.

 44.  ELGINDY, at all material times, owned the ELGINDY SITES. These were

private internet web sites whose members paid approximately $300-$1,500 to be members of the

sites, and worked in concert to short the stock selected by ELGINDY, JOHN DOES 1 through

40, and the ELGINDY ACCOMPLICES (these parties are collectively referred to as the "Conspirators"). The sole purpose of the sites was to use the collective financial wealth of the Conspirators to manipulate the prices of the publicly traded shares of public companies by continually selling shares into the market to produce a downward pressure on the price of the said shares, specifically including CYBR.

45.    The Conspirators did not own and could not deliver the shares they sold. Instead, they sold stock they did not own, in a concerted effort, including through the internet chat-rooms and ELGINDY SITES, to force the price of the stock downward, and then profit by buying the stock back at a lower price, thus "covering" their short sale and generating massive profits for themselves.

46.    To help force stock prices downward, the Conspirators would also attempt to cause the legitimate shareholders to sell stock at reduced prices by spreading false and misleading information and rumors of the downfall of the targeted company, including Cybercare, Inc. Because the targeted companies had only limited resources and a limited public market for their respective shares, the flooding of the market with sale orders, including sale orders from Defendants identified in paragraphs 1-13, and bad news led to the downward spiral in the price of the shares of the targeted public company, including shares of CYBR. The spread between the sale price at which the Conspirators sold the stock short, and the price at which the stock was later purchased to cover the short sales, was their profit.

47.    The Defendants ELGINDY and the ELGINDY ACCOMPLICES entered into a scheme to drive down the price of CYBR stock. These Defendants obtained information from FBI agents that was stored on electronic media for investigative purposes, and which would not have otherwise been available to the general public, and disseminated the same over the internet and via telephone, all in interstate commerce. This information was intended to and did, in fact,

15

adversely affects the price of the shares of the targeted companies, and was given to certain FBI agents who then commenced investigations based on this information. Cybercare, Inc. was one of the companies targeted and became the victim of this course of action by these Defendants. The combination of the adverse information and the investigation of Cybercare, Inc. by the FBI resulted in Defendants being successful in driving down the price of CYBR stock in the public market.

48.    The BROKERS and BROKER DEALER Defendants participated in and contributed to the aforementioned activities by selling shares they did not own on their own account and by encouraging and advising, and aggressively facilitating the sales made by the Conspirators.

49.    The Defendants, acting in concert, inflated the apparent number of shares in the marketplace through naked short selling of stock. The Defendants used this falsely inflated and misleading number of shares and related illegal share transactions to manipulate the price of the stock. The Defendants continuously sold CYBR stock they did not own, and could not deliver, as required by law, thus creating a glut in the marketplace, and thus causing the price of the CYBR shares to drop, including those owned by Plaintiff.

50.    The CYBR stock, from the time CAPECE could have sold his shares and until present date, has been selling in the range of $.30 to $.60 per share. Cybercare, Inc., as an operating business entity, was totally destroyed as a result of the naked short selling and other illegal activities by the Defendants.

## CIVIL RICO VIOLATIONS

51.    Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 51 above.

52.     As set forth above, Defendants, and each of them, acted as an enterprise engaged in and whose activities were fraudulent and otherwise illegal, and affected interstate commerce, all unrelated to securities fraud.  During the course of the underlying transactions, Defendants, in furtherance of their enterprise, devised and intended to devise a scheme and artifice to defraud and mislead and public through the illegal manipulation of the share price of Cybercare, Inc., by utilizing illegally obtained information from FBI agents, by publicly disclosing misleading information, by illegally flooding the market with "sell" orders when there was no compliance with short-selling regulations or shares available to deliver in connection with the sale transactions, by planning and acting in concert to coerce the financial community, including Plaintiff, into acting in a manner that furthered Defendants' greedy and illegal purposes and schemes.  The sole purpose of the enterprise was to create profit for the Defendants through their unlawful enterprise.  At all times, the Defendants, and each of them, knew their activities were illegal.  Throughout the above stated time period, and as more specifically described above, Defendants acting in concert with one another in their enterprise, and in conducting the affairs of the enterprise, for purpose of executing the aforesaid scheme and artifice, and, attempting to do so, utilized interstate commerce, the internet, and interstate phone service.

53.     In conducting their enterprise, the Conspirators and ELGINDY ACCOMPLICES directly violated 18 U.S.C. 121 (1)  in that they utilized information and accessed information that was stored in electronic media for the use of FBI agents on government business, and disseminated the same via interstate internet and telephonic services solely for the purpose of furthering their joint illegal scheme.  The remaining Defendants knew or should have known of these activities, but chose to take no investigative or other action, but instead, continued their profit-making enterprise.

54.     As a result of and by reason of the above described racketeering activity, through which the said enterprise's and association-in-fact's affairs were conducted in violation of 18 U.S.C. § 1962, Plaintiff has been damaged and is entitled to recover from the Defendants, jointly and severally, all damages proximately resulting from Defendants' wrongful conduct. Moreover, by virtue of Defendants' acts as set forth above, Plaintiff is entitled to recover triple their damages, in addition to their attorney's fees, together with their costs of this action, all pursuant to 18 U.S.C. § 1964 (c).

## NEGLIGENCE

55.     Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 55 above.

56.     The DTC, BROKERS and BROKERAGES were negligent in processing the illegal short sales of the Conspirators in violation of the rules for processing and clearing short trades, as well as the rules relating to delivery of securities.

57.     These Defendants knew or should have known that the processing of such trades, and failure to deliver securities, would negatively affect the market price of the said shares and, thereby, damage the Plaintiff as a direct and proximate result. Such conduct also interfered with contractual relationships and prospective economic advantages available to Cybercare, Inc., causing the share price of CYBR to go down dramatically.

58.     The damage suffered by the Plaintiff was a direct result of the negligence of the Defendants, and the Plaintiff seeks to recover all damages as a result of the said negligence.

## UNJUST ENRICHMENT AND ACCOUNTING

59.     Plaintiff incorporates herein by reference the factual statements set forth in Paragraphs 1 through 59 above.

60.     The Defendants purported to borrow and, electronically, were illegally allowed to borrow, without ever delivering or repaying/returning the borrowed shares, and/or borrowed, and/or allowed to be borrowed, shares from the public to further their enterprise, all as more fully set out above.

61.     The Defendants further took part in, or allowed, the illegal short selling and failure to deliver of Cybercare, Inc. stock.

62.     As a direct result, the Plaintiff was damaged, and the Defendants made profit at the expense of the Plaintiff.

63.     The Plaintiff demands an accounting by the Defendants respecting the transactions engaged in with CYBR shares and the profits made through their enterprise, including the transactions engaged in at the expense of Plaintiff.

64.     The Plaintiff demands that such amount as was profit to the Defendants be paid over to Plaintiff, as the Defendants have been unjustifiably enriched at the expense of Plaintiff.

65.     Plaintiff has no adequate remedy at law.

## FRAUD

66.     Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 66 above.

67.     Defendants, including the Conspirators, did knowingly defraud the Plaintiffs by manipulating the market price of the shares of NASDAQ, as abovementioned.

68.     As a direct and proximate result of said Defendants' actions, Plaintiff has been severely damaged, and seeks to recover such damages. Also, because the said Defendants' actions were wanton, reckless conduct, designed to create profit by directly and knowingly injuring Plaintiff, and because such is morally reprehensible, and offends public policy, Plaintiff also seeks to recover punitive and exemplary damages.

## DECEPTIVE TRADE PRACTICES

69.     Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 69 above.

70.     Defendants have committed one or more violations of the Florida Deceptive Trade Practices – Consumer Protection Act. Plaintiff is a consumer, as defined in the said Act

71.     The conduct of one or more of the Defendants constitutes a deceptive trade practice, as defined by the Act.

72.     Plaintiff seeks damages and such other relief as is permissible pursuant to the said Act.

## CONSPIRACY

73.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 73 above.

74.     Pleading further, by the acts and omissions alleged throughout this Complaint, the Defendants herein conspired one with the other, for the common purpose of accomplishing an unlawful purpose or to accomplish a lawful purpose by unlawful means.   The Defendants knowingly and purposely committed one or more overt acts in furtherance of the conspiracy as set forth above.  As a result of such conspiracy, Plaintiff has been damaged and is entitled to recover from the Defendants, jointly and severally, all damages proximately resulting from Defendants' wrongful conduct.

75.     The Defendants acted with tortuous disregard of the Plaintiff's rights.  Further, Defendants acted in a wanton and malicious manner for the purpose of causing harm to Plaintiff. Such conduct entitles Plaintiff to punitive and exemplary damages to act as a deterrence to prevent similar behavior in the future, as well as damages for the losses suffered by Plaintiff.

## INJUNCTION AND DECLARATORY RELIEF

76.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 76 above.

77.     This is an action within this Court's equitable jurisdiction.

78.     Plaintiff will suffer immediate and irreparable harm to his business reputation and loss of its good will, unless the status quo is maintained. Should the Defendants be allowed to continue their short selling activities, Plaintiff will be irretrievably damaged.

79.     There is a reasonable likelihood of success on the merits of the Plaintiff's claims.

80.     Plaintiff has no adequate remedy at law and there is no plain, speedy and adequate remedy of law.

81.     Plaintiff has a clear legal right to the relief requested.

82.     The balance of equities favors the entry of a Temporary Restraining Order and Preliminary Injunction.

83.     The issuance of a Temporary Restraining Order and Preliminary Injunction will serve the public interest.

84.     Plaintiff seeks injunctive relief against the Defendants to have them cease and desist from their short selling activities, and failures to deliver.

85.     Plaintiff further seeks a declaratory judgment of this Court, ordering Defendants to buy-in with respect to any current short positions, and present proof that they no longer have any short positions with respect to the shares of Cybercare, Inc.

## RELIEF DEMANDED

1.      For general damages in excess of $50,000,000.00 from each Defendant in favor of each Plaintiff;

2.      For special damages as proven at the time of trial;

21

3.      For punitive damages in excess of $50,000,000.00 from each Defendant in favor of each Plaintiff;

4.      For reasonable attorney fees;

5.      For treble damages and attorneys' fees under the RICO statutes;

6.      For an accounting from each Defendant of all transactions involving CYBR securities from January 1, 2000, through date of accounting, specifically including the electronic records of DTC regarding the lending of CYBR shares to DTC Participants (including the sub-C and sub-D accounts at the NSCC for each Participant) and monies derived by DTC there from;

7.      For a temporary and permanent injunction;

8.      For a declaratory judgment;

9.      For costs of suit and statutory interest; and

10.     For any such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

DATED this _27_ day of April, 2004

LAW OFFICES OF ROBERT C. STONE, P.A.
555 South Federal Highway
Suite 450
Boca Raton, Florida 33432
Telephone: (561) 338-4844
Facsimile: (561) 338-4807

By: _____
        ROBERT C. STONE, ESQUIRE
        Florida Bar No.: 106117

# Exhibit 4



U.S. Securities and Exchange Commission

## Division of Market Regulation:
## Responses to Frequently Asked Questions Concerning
## Regulation SHO

Responses to these frequently asked questions were prepared by and
represent the views of the staff of the Division of Market Regulation
("Staff"). They are not rules, regulations, or statements of the Securities
and Exchange Commission ("Commission"). Further, the Commission has
neither approved nor disapproved these interpretive answers.

**For Further Information Contact:** Any of the following attorneys in the
Office of Trading Practices, Division of Market Regulation, Securities and
Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-
1001, at (202) 942-0772: James Brigagliano, Assistant Director, Lillian
Hagen, Alexandra Albright, and Liza Orr, Special Counsels, Roxanne
Malaspina, Attorney, or Peter Chepucavage, Attorney Fellow.

### I. Introduction

A short sale is the sale of a security that the seller does not own and any
sale that is consummated by the delivery of a security borrowed by, or for
the account of, the seller. In order to deliver the security to the purchaser,
the short seller will borrow the security, typically from a broker-dealer or an
institutional investor. The short seller later closes out the position by
purchasing equivalent securities on the open market, or by using an
equivalent security it already owned, and returning the borrowed security
to the lender. In general, short selling is used to profit from an expected
downward price movement, to provide liquidity in response to unanticipated
demand, or to hedge the risk of a long position in the same security or in a
related security.

Regulation SHO became effective on September 7, 2004. (Securities
Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6,
2004) ("Adopting Release")). The commencement date to comply with the
provisions of Regulation SHO is January 3, 2005. Pursuant to the terms of
Regulation SHO, the Commission approved an order establishing a one-year
pilot program ("Pilot") suspending the provisions of Rule 10a-1(a) under
the Securities Exchange Act of 1934 ("Exchange Act") and any short sale
price test of any exchange or national securities association ("SRO") for
short sales of certain securities for certain time periods. (See Securities
Exchange Act Release No. 50104 (July 28, 2004), 69 FR 48032 (August 6,
2004) ("Pilot Order")). The Adopting Release and the Pilot Order may also
be found on the Commission's Internet web site
(http://www.sec.gov/spotlight/shortsales.htm). (See also
http://www.sec.gov/rules/final/34-50103.htm for the Adopting Release,
and http://www.sec.gov/rules/other/34-50104.htm for the Pilot Order). On
November 29, 2004, the Commission approved an order resetting the Pilot

to commence on May 2, 2005 and end on April 28, 2006. (*See* Securities Exchange Act Release No. 50747 (November 29, 2004), 69 FR 70480 (December 6, 2004) ("Second Pilot Order")). The Second Pilot Order may be also be found on the Commission's Internet web site (http://www.sec.gov/spotlight/shortsales.htm). (*See also* http://www.sec.gov/rules/other/34-50747.htm). Although the Second Pilot Order resets the start date and end date for the Pilot, the other terms of the Pilot Order remain unchanged, and the compliance date for all other provisions of Regulation SHO remains January 3, 2005. The Commission from time to time may approve further orders affecting the Pilot.

Regulation SHO provides a new regulatory framework governing short selling of securities. Regulation SHO is designed, in part, to fulfill several objectives, including (1) establish uniform locate and delivery requirements in order to address problems associated with failures to deliver, including potentially abusive "naked" short selling (*i.e.*, selling short without having borrowed the securities to make delivery); (2) create uniform marking requirements for sales of all equity securities; and (3) establish a procedure to temporarily suspend Commission and SRO short sale price tests in order to evaluate the overall effectiveness and necessity of such restrictions. Moreover, the rules are consistent with the objective of simplifying and modernizing short sale regulation, providing controls where they are most needed, and temporarily removing restrictions where they may be unnecessary.

Specifically, Regulation SHO replaces Commission Rules 3b-3, 10a-1(d), 10a-1(e)(13) and 10a-2 with the following provisions:

- *Rule 200 – Definitions and Marking Requirements.* Rule 200 incorporates and amends Rules 3b-3, 10a-1(d) and 10a-1(e)(13). It defines ownership for short sale purposes, and clarifies the requirement to determine a short seller's net aggregate position. It also incorporates requirements to mark sales in all equity securities "long," "short," or "short exempt."

- *Rule 202T – Pilot Program.* Rule 202T is a temporary rule that creates a procedure by which the Commission issued the Pilot Order to establish the Pilot. It also creates a procedure by which the Commission may issue additional orders relating to the Pilot. This rule is scheduled to expire on August 6, 2007.

- *Rule 203 – Locate and Delivery Requirements.* Rule 203 incorporates Rule 10a-2 and existing SRO rules into a uniform Commission rule. It requires broker-dealers, prior to effecting short sales in all equity securities, to locate securities available for borrowing in order to be able to deliver securities on the settlement date of the transaction. It also imposes additional requirements on broker-dealers for securities in which a substantial amount of failures to deliver have occurred.

The Commission decided to defer consideration of proposed Rule 201, which would have replaced the current "tick" test of Rule 10a-1(a) with a new uniform bid test restricting short sales to a price above the consolidated best bid, subject to certain exceptions. (*See* Securities Exchange Act Release No. 48709 (October 28, 2003), 68 FR 62972 (November 6, 2003) ("Proposing Release"), which may also be found on the

Commission's Internet web site at http://www.sec.gov/rules/proposed/34-48709.htm). The Commission will reconsider any further action on these proposals after the completion of the Pilot.

Regulation SHO sets forth the requirements for conducting short sale transactions in equity securities. Other rules and regulations may apply also to short sales; for example, the margin requirements of Regulation T. Market participants conducting short sale transactions are responsible for complying with Regulation SHO as well as any other rules and regulations that may apply to their short sale transactions.

The following questions and answers regarding Regulation SHO have been compiled by the Staff to assist in the understanding and application of this regulation and the Pilot. These questions and answers are intended to provide general guidance. Facts and circumstances of a particular transaction may differ, and the Staff notes that even slight variations may require different responses. The Commission is not bound by the statements and may interpret Regulation SHO in any manner that it deems necessary or appropriate in the public interest or for the protection of investors.

The Staff may update these questions and answers periodically. In each update, the questions added after publication of the last version will be marked with **"NEW!"**

## II. Responses to Frequently Asked Questions

### 1. General

#### Question 1.1: When should market participants comply with Regulation SHO?

**Answer:** Regulation SHO became effective on September 7, 2004. However, market participants are required to begin complying with Regulation SHO on January 3, 2005. Regulation SHO has a long compliance period to permit broker-dealers and SROs to make necessary systems changes and other order processing adjustments.

On November 29, 2004, the Commission approved an order resetting the Pilot to commence on May 2, 2005 and end on April 28, 2006. Although the Second Pilot Order resets the start date and end date for the Pilot, the other terms of the Pilot Order remain unchanged. Furthermore, the compliance date for all other provisions of Regulation SHO remains January 3, 2005.

#### Question 1.2: When does Regulation SHO supplant existing SRO Rules?

**Answer:** Regulation SHO supplants any conflicting SRO short sale rule. For example, SROs that have their own rules regarding locate and delivery have filed and are filing proposed rule changes with the Commission that will suspend such rules.

However, Regulation SHO does not conflict with SRO rules that have a

Case 2:05-cr-80498-KLB  Document 1  Entered on FLSD Docket 06/03/2005  Page 71 of 88

purpose other than short sales. For example, NYSE Rule 80A is not directed at short sales, as such, but rather has a different purpose (*i.e.*, reducing market volatility). For this reason, Regulation SHO does not supplant NYSE Rule 80A.

**Question 1.3: How does Regulation SHO apply to overseas transactions?**

**Answer:** Footnote 54 of the Adopting Release states that any broker-dealer using the United States jurisdictional means to effect short sales in securities traded in the United States are subject to Regulation SHO, regardless of whether the broker-dealer is registered with the Commission or relying on an exemption from registration. The Proposing Release explains that short sale regulation applies to trades in reported securities when the trades are agreed to in the United States, even if the trades are booked overseas. (68 FR at 62997 and 62998). Whether a short sale is executed or agreed to in the United States will depend on the particular facts and circumstances of the transaction. The Proposing Release provides some examples of when we would consider a short sale to have been agreed to in the United States. (68 FR at 62997 and 62998). For further information about how the provisions of Regulation SHO may apply to overseas transactions, please refer to Question 4.6.

**Question 1.4: Does Regulation SHO apply to bonds?**

**Answer:** Regulation SHO applies to short sales of equity securities. The term "equity security" is defined in Section 3(a)(11) of the Exchange Act and Rule 3a11-1 thereunder (17 CFR 240.3a11-1). A security convertible into an equity security is an equity security. Therefore, short sales of bonds that are convertible into equity would be subject to Regulation SHO. The Staff will consider on a case-by-case basis securities, including structured products, to which the "equity" status may not be clear.

**Question 1.5: Do the requirements of Rule 203 of Regulation SHO apply to short sales made in connection with underwritten offerings?**

**Answer**: Syndicate activity is not expressly addressed in Regulation SHO. However, the Staff will not recommend enforcement action for violation of Rule 203(b)(1) of Regulation SHO (locate requirement) with regard to any sale by an underwriter, or any member of a syndicate or group participating in the distribution of a security, in connection with an over-allotment of securities, or any lay-off sale by such a person in connection with a distribution of securities through rights or a standby underwriting commitment.

In addition, the Staff will not recommend enforcement action for violation of Rule 203(b)(3) of Regulation SHO (close-out and pre-borrow requirements) with respect to a net syndicate short position created in connection with a distribution of a security that is part of a fail to deliver position at a registered clearing agency in a threshold security that has persisted for 13 consecutive settlement days, if action is taken to close out the net syndicate short position no later than the 30th day after commencement of sales in the distribution.

## 2. Order Marking Requirements – Rule 200(g)

**Question 2.1: Should a broker or dealer mark a short sale order "short exempt" if the order involves an OTCBB stock?**

**Answer:** Rule 200(g)(2) provides that a short sale shall be marked "short exempt" if the seller is relying on an exception from the tick test of Rule 10a-1 or any short sale price test of any SRO. Securities traded on the over-the-counter bulletin board ("OTCBB") are not subject to any short sale price tests and are therefore do not rely on an exception from such price tests. As such, they need not be marked "short exempt." Short sales in such securities may continue to be marked "short."

**Question 2.2: May market participants presume that an "S" designation on an order indicates that an order is "sell long" and an "SS" designation on an order indicates that an order is "sell short?" Do these designations satisfy the new marking requirements under Regulation SHO?**

**Answer:** Under Rule 200(g), brokers and dealers must mark all sell orders of any equity security as "long," "short," or "short exempt." The primary objective is to make sure that orders are marked and executed properly and that accurate data on those orders is available for the pilot study and for surveillance and compliance purposes. For this reason, the Staff strongly suggests that firms use the designations specified in Rule 200(g) of Regulation SHO. The firms, however, may use other designations to identify long, short and short exempt trades, and to process the orders properly. The designations should follow a clear and consistent methodology for marking orders, and clear and accurate records must be maintained to demonstrate compliance.

**Question 2.3: May a seller mark an order "long" if the seller owns the security pursuant to Rule 200(b) but is not "net long" in the security?**

**Answer:** Rule 200(c) provides that a person shall be deemed to "own" securities only to the extent that the person has a "net long" position in such securities. Therefore, a seller must be net long in a security in order to mark "long" an order for that security. Rule 200(c) does not change the "net long" requirement of former Rule 3b-3.

## 3. Trade Execution

**Question 3.1: How should brokers and dealers process orders when the normal closing time for a regular trading day has changed (e.g., early closing of markets for holidays)?**

**Answer:** Footnote 17 of the Pilot Order explains that 4:15 pm was designated as the end of regular trading activity for Regulation SHO because regular trading hours normally end at 4:00 pm, and an extra 15 minutes was added because trade reporting can be delayed and continue past 4:00 pm. For days when regular trading hours end earlier than 4:00 pm, the time designated as the end of regular trading for the purposes of Regulation SHO should be the time the trading hours end on those days

plus 15 minutes.

**4. Locate and Delivery Requirement – Rules 203(b)(1) and (2)**

**Question 4.1: How should broker-dealers determine "reasonableness" to satisfy the locate requirement of Regulation SHO?**

**Answer:** Rule 203(b)(1)(ii) permits a broker or dealer to accept a short sale order in an equity security if the broker-dealer has reasonable grounds to believe that the security can be borrowed so that it can be delivered on the settlement date. "Reasonableness" is determined based on the facts and circumstances of the particular transaction. What is reasonable in one context may not be reasonable in another context. The Commission provided some examples of reasonableness in the Adopting Release. (69 FR at 48014 and Footnotes 58, 61 and 62).

**Question 4.2: How may broker-dealers use Easy to Borrow lists?**

**Answer:** The Adopting Release states that Easy to Borrow lists generally may be used to establish a reasonable basis for a locate. (69 FR at 48104). Easy to Borrow lists are prepared by a firm to indicate that firm's ability to supply the identified securities. Therefore, for example, introducing firms may rely on Easy to Borrow lists of the clearing firms through which they clear and settle transactions unless circumstances indicate that it would not be reasonable to rely on such lists. For example, if the securities on the Easy to Borrow list have experienced delivery failures, it would not be reasonable to rely on the list. Furthermore, if the Easy to Borrow list is prepared by a clearing firm through which the introducing firm does not clear or settle transactions, or otherwise does not maintain a relationship in which the clearing firm agrees to make securities on its Easy to Borrow lists available to the introducing firm, then it would not be reasonable to rely on the list.

**Question 4.3: May an executing broker rely on customer representations that a short sale is supported by a locate from the stock loan department of the executing broker, then execute the order, and then confirm the locate later in the same day or the next morning?**

**Answer:** The executing broker has the responsibility to perform the locate prior to effecting a short sale, and must have a reasonable basis to believe that the security can be delivered on the settlement date. Footnote 58 of the Adopting Release explains that a broker-dealer may obtain an assurance from a customer that the customer can obtain securities from another identified source in time to settle the trade. The executing broker may rely on a customer's representation that an order to sell short a security is supported by a locate obtained by the customer from the stock loan department of the executing broker, or any other identified entity that is authorized to loan stock, as long as reliance on such representation is reasonable. However, where a broker-dealer knows or has reason to know that a customer's prior assurances resulted in failures to deliver, assurances from such customer would not provide the reasonable grounds required for a locate.

Rule 203(b)(1) requires that the executing broker document the locate. Documentation should include the source of the securities cited by the customer. Documentation should also include support for the reasonable grounds to rely on customer assurances. For example, an executing broker may provide information showing that previous borrowings arranged by the customer resulted in timely deliveries of securities to settle the customer's transactions.

After the executing broker executes a short sale, the executing broker may take steps to confirm the locate information provided by the customer. Confirmation of the locate after the execution of a short sale may provide information on whether the locate based on customer representations was reasonable. However, confirmation after the fact is not a substitute for a locate that is required to be performed before a short sale may be executed.

### Question 4.4: May an executing broker-dealer re-apply a locate for intra-day buy-to-cover trades?

*Answer:* A locate for a security may be re-applied for an intra-day buy-to-cover trade in the following scenario:

Prior to a customer's short sale of 100 shares of XYZ stock, the executing broker-dealer obtains an appropriate locate for the securities. The short sale is then executed. Subsequently that day, the broker-dealer purchases 100 shares of XYZ stock for the customer, and the customer's net trading position is flat. If the customer wants to then sell short another 100 shares of XYZ stock in the same trading day, the executing broker-dealer may apply the original locate to that sale, provided that such subsequent short sale is for an amount of securities that is no greater than the amount of securities obtained in the original locate, and provided further that the source of the located shares indicates that the original locate is good for the entire trading day.

For a "hard to borrow" security or a threshold security, a broker-dealer may not re-apply a locate for intra-day buy-to cover trades. Without obtaining locates prior to each short sale in such securities in the scenario described above, it is unlikely that the broker-dealer executing such trades would have reasonable grounds to believe that such securities can be borrowed so that they can be delivered on the date that delivery is due on each trade. A broker-dealer, however, may have reasonable grounds to believe that securities will be available when delivery is due on such short sales if the broker-dealer pre-borrows the securities.

### Question 4.5: Does the locate requirement apply to convertible securities?

*Answer:* The locate requirement applies to all equity securities. The term "equity security" is defined in Section 3(a)(11) of the Exchange Act and Rule 3a11-1 thereunder (17 CFR 240.3a11-1). A security convertible into an equity security is an equity security; therefore, such convertibles would be subject to the locate requirement. The Staff will consider on a case-by-case basis securities, including structured products, to which the "equity" status may not be clear.

A convertible security that is subject to the locate requirement may qualify for an exception. Rule 203(b)(2)(ii) provides an exception from the uniform locate requirement for situations in which a broker-dealer effects a sale on behalf of a customer that is deemed to "own" the security although, through no fault of the customer or the broker-dealer, it is not reasonably expected that the security will be in the physical possession or control of the broker-dealer by the settlement date. The Adopting Release states that such circumstances could include the situation where a convertible security, option, or warrant has been tendered for conversion or exchange, but the underlying security is not reasonably expected to be received by the settlement date. (69 FR at 48015). In such situation, delivery should be made on the sale as soon as all restrictions on delivery have been removed, and in any event within 35 days after trade date. If delivery is not made within 35 days after the trade date, the broker-dealer that sold on behalf of the person must either borrow securities or close out the open position by purchasing securities of like kind and quantity.

**Question 4.6: May a U.S. broker-dealer that executes orders on behalf of a foreign broker-dealer rely on a locate by such foreign broker-dealer in the same way that the U.S. broker-dealer may rely on a locate by a U.S. broker-dealer or customer?**

**Answer:** Rule 203(b)(1)(ii) permits a broker or dealer to accept a short sale order in an equity security if the broker-dealer has reasonable grounds to believe that the security can be borrowed so that it can be delivered on the settlement date. The U.S. broker-dealer may rely on a locate of a foreign broker-dealer in the same way that the U.S. broker-dealer may rely on a locate of a U.S. broker-dealer or customer: the facts and circumstances must provide a basis for a reasonable belief that the security will be available for delivery on the settlement date.

Moreover, the locate information must be documented. Consistent with Footnote 58 of the Adopting Release, the documentation should include the source of the securities given by the foreign broker-dealer as the basis for the locate and support for the reasonableness of the reliance on the foreign broker-dealer. For further information about how the provisions of Regulation SHO may apply to overseas transactions, please refer to Question 1.3.

**Question 4.7: Market makers, as defined in Section 3(a)(38) of the Exchange Act, include block positioners. Regulation SHO provides an exception to the locate requirement for market makers. Are all block positioners excepted from the locate requirement?**

**Answer:** Rule 203(b)(2)(iii) provides an exception from the locate requirement for short sales effected by market makers, but only in connection with bona-fide market making activities. Rule 203(c)(1) provides that the term "market maker" has the same meaning as in Section 3(a)(38) of the Exchange Act, which defines "market maker" as "any specialist permitted to act as a dealer, any dealer acting in the capacity of a block positioner, and any dealer that, with respect to a security, holds itself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for its own account on a regular or continuous basis."

The term "block positioner" is not defined in Regulation SHO or the Exchange Act. However, for purposes of Regulation SHO, the Staff interprets this term to have the same meaning as in Rule 3b-8(c) of the Exchange Act (17 CFR 240.3b-8(c)), which defines a "qualified block positioner" as a dealer that: (1) is a broker or dealer registered pursuant to Section 15 of the Exchange Act; (2) is subject to and in compliance with Rule 15c3-1 of the Exchange Act (17 CFR 240.15c3-1); (3) has and maintains minimum net capital, as defined in Rule 15c3-1, of $1,000,000; and (4) except when such activity is unlawful, meets all of the following conditions: (i) engages in the activity of purchasing long or selling short, from time to time, from or to a customer (other than a partner or a joint venture or other entity in which a partner, the dealer, or a person associated with such dealer, as defined in Section 3(a)(18) of the Exchange Act, participates) a block of stock with a current market value of $200,000 or more in a single transaction, or in several transactions at approximately the same time, from a single source to facilitate a sale or purchase by such customer, (ii) has determined in the exercise of reasonable diligence that the block could not be sold to or purchased from others on equivalent or better terms, and (iii) sells the shares comprising the block as rapidly as possible commensurate with the circumstances.

Therefore, block positioners may rely on the exception to the locate requirement in connection with bona-fide block positioning activities.

### Question 4.8: What constitutes "bona-fide market making activities?"

**Answer:** The term "bona-fide market making" refers to bona-fide activities described in Section 3(a)(38) of the Exchange Act. Whether activity is "bona-fide" will depend on the facts and circumstances of the particular activity. However, the Adopting Release sets forth examples of activities that would *not* be considered to be "bona-fide market making activities." (69 FR at 48015).

### Question 4.9: How does the locate requirement apply to short sales of securities in a Rule 144 transaction?

**Answer:** Rule 203(b)(2)(ii) provides an exception from the uniform locate requirement for situations in which a broker-dealer effects a sale on behalf of a customer that is deemed to "own" the security although, through no fault of the customer or the broker-dealer, it is not reasonably expected that the security will be in the physical possession or control of the broker-dealer by the settlement date. Footnote 71 of the Adopting Release states that one such situation is where a customer owns stock that was formerly restricted, but presently may be sold pursuant to the provisions of Rule 144 under the Securities Act of 1933 (17 CFR 230.144). Rule 144 securities may not be capable of being delivered on settlement date due to processing to remove the restricted legend. In such situation, delivery should be made on the sale as soon as all restrictions on delivery have been removed, and in any event within 35 days after trade date. If delivery is not made within 35 days after the trade date, the broker-dealer that sold on behalf of the person must either borrow securities or close out the open position by purchasing securities of like kind and quantity.

### 5. Close-Out and Pre-Borrow Requirements – Rule 203(b)(3)

**Question 5.1: Does the close-out requirement apply to open fail positions in securities that exist prior to January 3, 2005?**

*Answer:* The Adopting Release states that the requirement to close out fail to deliver positions in threshold securities that remain for 13 consecutive settlement days does not apply to any positions that were established prior to the security becoming a threshold security. (69 FR at 48018, and Rule 203(b)(3)(i)). On January 3, 2005, no securities will have been identified as threshold securities. Therefore, open fail positions in securities that exist prior to January 3, 2005 will not be required to be closed out under Regulation SHO. However, this does not affect the obligation of sellers of securities to deliver those securities to buyers under existing delivery and settlement guidelines.

As explained in Question 6.1, on January 3, 2005, the SROs will begin the calculations necessary to determine whether securities qualify as threshold securities. January 10, 2005 is the first day on which SROs will publish threshold lists. Until a security appears on a threshold list for 13 consecutive settlement days and an open fail position for such security exists for those days, Regulation SHO does not require a broker or dealer to close out the open fail position. Therefore, the first day on which a close-out action would be required is January 28, 2005.

**Question 5.2: Must an open fail position be closed out if a security is not a threshold security on the trade date but later appears on a threshold list? Must an open fail position be closed out if a security is a threshold security on the trade date but later does not appear on a threshold list?**

*Answer:* The close-out and pre-borrow requirements of Regulation SHO are based on settlement days, not trade days. Under Regulation SHO, it is irrelevant whether a security is a threshold security on the date that it is sold short. The close-out and pre-borrow requirements apply if a security is a threshold security for 13 consecutive settlement days and a participant in a registered clearing agency has open delivery failures in that security on each of those days.

For example, if a participant sells short a security that is not a threshold security on the date of sale, the close-out and pre-borrow requirements would not apply to a fail to deliver position on the participant's net short settlement obligation unless the security later becomes a threshold security and it maintains that status for 13 consecutive settlement days and the participant has delivery failures for all of those days. On the other hand, a participant must close out a fail to deliver position in a threshold security that has persisted for 13 consecutive settlement days irrespective of the dates of the participant's trades in that security. If the security ceases to be a threshold security prior to the 13th consecutive settlement day that a participant has a fail position in the security, there would be no obligation under Regulation SHO to close out the fail position.

**Question 5.3: Does the close-out requirement apply to delivery failures that do not occur at a registered clearing agency?**

*Answer:* We interpret the close-out requirement to apply only to fail to

deliver positions at a registered clearing agency. Our interpretation is based on our understanding that transactions conducted outside the Continuous Net Settlement System ("CNS") operated by the National Securities Clearing Corporation ("NSCC") are rare. If this historical pattern changes and a significant level of fails are not included in CNS, we will reconsider this position.

**Question 5.4: When entering into an arrangement to pre-borrow a threshold security, must a firm clean up the entire amount of the fail before accepting additional orders to sell short such threshold security? Or, may the firm effect short sale orders up to the amount of shares of the threshold security that is pre-borrowed?**

**Answer:** Under Rule 203(b)(3), when a participant of a registered clearing agency has a net settlement failure in a threshold security for 13 consecutive settlement days, two consequences follow: (1) the participant must immediately take steps to close out the fail to deliver position; and (2) until the fail to deliver position is closed out, the participant and any broker or dealer for which it clears transactions must borrow the security that is the subject of the fail, or enter into a bona-fide arrangement to borrow such security before the participant or such broker or dealer may effect any subsequent short sales in such security. This pre-borrow requirement remains in place until the participant closes out the entire fail to deliver position. Therefore, a participant that has a close-out obligation for a threshold security may effect short sale orders for such threshold security up to the amount pre-borrowed.

Rule 203(b)(3)(iv) permits the participant to reasonably allocate a portion of a fail to deliver position to another registered broker or dealer for which it clears trades or for which it is responsible for settlement, based on such broker's or dealer's short position. If the participant has reasonably allocated the fail to deliver position, the provisions of Rule 203(b)(3) relating to such fail to deliver position shall apply to the portion of such registered broker or dealer that was allocated the fail to deliver position, and not to the participant.

**Question 5.5: When must the close-out be initiated?**

**Answer:** Rule 203(b)(3) provides that participant of a registered clearing agency that has a net settlement failure in a threshold security for 13 consecutive settlement days must immediately take steps to close out the fail to deliver position. The close-out process must be initiated no later than the beginning of trading on the trading day following the 13th consecutive settlement day with a net short settlement obligation.

**Question 5.6: If a threshold security also qualifies as an "owned" security within the meaning of Rule 203(b)(2)(ii), when should the firm close out the short position: after the 13th consecutive settlement day; or the day that is 35 days after the trade date?**

**Answer:** The close-out requirement that applies to threshold securities in Rule 203(b)(3)(iii) is based on net short positions, not trade dates. If a participant of a registered clearing agency has a fail to deliver position at a registered clearing agency in a threshold security for 13 consecutive

settlement days, the participant must take action to close out the fail to deliver position after the 13th consecutive settlement day (*see* Question 5.5), and, until the close-out obligation is satisfied, the participant must pre-borrow securities prior to effecting any subsequent short sales in such threshold security (*see* Question 5.4).

**(NEW! 05/24/05)**

**Question 5.7: If a participant of a registered clearing agency has a fail to deliver position at a registered clearing agency in a threshold security for 13 consecutive settlement days and immediately thereafter purchases securities of like kind and quantity to close out the fail to deliver position as required under Rule 203(b)(3), will the participant be deemed to have satisfied the close-out obligation on the day the purchase is executed, or on the day the purchase settles?**

**Answer:** Rule 203(b)(3) provides that a participant of a registered clearing agency that has a fail to deliver position in a threshold security for 13 consecutive settlement days must immediately thereafter close out the fail to deliver position by purchasing securities of like kind and quantity. Until the close-out obligation is satisfied, a participant must pre-borrow securities to effect any new short sales in such threshold securities.

The Staff interprets the phrase "purchasing securities of like kind and quantity" in Rule 203(b)(3) to mean that a participant satisfies the obligation to close out an open fail to deliver position in a threshold security that has persisted for 13 consecutive settlement days when such participant executes a purchase of securities, and where:

- the purchase is a bona fide transaction;

- the purchase is executed on settlement day 11, 12 or 13;

- the purchase is submitted to a registered clearing agency for settlement;

- the purchase is of a quantity of securities sufficient to close out the entire amount of the open fail position that has persisted for 11, 12 or 13 consecutive settlement days, as applicable; and

- the net purchases of the threshold security effected by the participant on that day, as reflected in such participant's books and records, are at least equal to the amount of such participant's open fail to deliver position in such threshold security on that day.

Purchases to close out fail to deliver positions in threshold securities must be bona-fide purchases. Rule 203(b)(3)(v) provides that where a participant enters into an arrangement with another person to purchase securities to close out an open fail to deliver position in a threshold security, and the participant knows or has reason to know that the other person will not deliver securities in settlement of the purchase, the participant will not be deemed to have fulfilled the close-out requirements of Rule 203(b)(3).

The Staff's interpretation that a participant satisfies the close-out obligation on the day when such participant executes a purchase of securities applies only to fail positions that are or are projected to be subject to the close-out requirements of Rule 203(b)(3); i.e., to purchases made on settlement day 11, 12, or 13. Therefore, this interpretation does not apply to purchases made on settlement day 10 or earlier, because there is no present or projected close-out requirement and such purchases would settle on or before 13 consecutive settlement days has elapsed.

The close-out requirement that applies to "owned" securities in Rule 203(b)(2)(ii), however, is a sale-based provision that does not apply directly to net short positions and is not limited to sales of threshold securities. It provides an exception from the locate requirement for a short sale of an "owned" security, provided that the broker or dealer has been reasonably informed that the person intends to deliver such security as soon as all restrictions on delivery have been removed. If the person has not delivered such security within 35 days after the date of sale, the broker or dealer that effected the sale must borrow securities or close out the short position by purchasing securities of like kind and quantity.

These close-out requirements operate independently and concurrently. Therefore, if an "owned" security is a threshold security, the security must be delivered within 35 days of the trade date, and a fail to deliver position in that security must be closed out after 13 consecutive settlement days of delivery failures.

## 6. Threshold Securities – Rule 203(c)(6)

### Question 6.1: Who is responsible for providing lists of threshold securities? When will the threshold lists be provided?

**Answer:** The SROs will disseminate threshold lists that will contain securities that are listed on their market systems and that exceed the specified fail level for at least five consecutive settlement days. A threshold security is expected to appear on one list. If a threshold security is listed on more than one market system, we understand that the SROs have agreed that the security will appear only on the threshold list of the SRO that maintains the primary listing.

On January 3, 2005, the SROs will begin the calculations necessary to determine whether securities may qualify as threshold securities. This process is described in greater detail in Question 6.2. On January 10, 2005, the SROs should disseminate the first threshold lists. SROs are expected to disseminate their threshold lists before the commencement of each trading day. We understand that the SROs have agreed to make all their lists publicly available at or before midnight each trading day. Therefore, these threshold lists will be in effect for the open of trading immediately following the posting of the threshold lists. We further understand that SROs will make threshold data available on their web sites in a downloadable, uniform, pipe-delimited ASCII format.

### Question 6.2: How will SROs determine which securities should be included on a threshold list?

**Answer:** Any equity security of an issuer that is registered under Section 12 or that is required to file reports pursuant to Section 15(d) of the Exchange Act could qualify as a threshold security. Therefore, threshold securities may include those equity securities that trade on the OTCBB or on the pink sheets, as well as those that trade on the exchanges or Nasdaq.

At the conclusion of each settlement day, NSCC will provide the SROs with data on securities that have aggregate fails to deliver at NSCC of 10,000 shares or more. For the securities for which it is the primary market, each SRO will use this data to calculate whether the level of fails is equal to at least 0.5% of the issuer's total shares outstanding of the security. If, for five consecutive settlement days, such security satisfies these criteria, then such security will be a threshold security. Each SRO should include such security on its daily threshold list until the security no longer qualifies as a threshold security.

**(NEW! 05/06/05)**

**7. Clearance and Settlement**

**Question 7.1: Do naked short sale transactions create "counterfeit shares?"**

**Answer:** Some believe that naked short sale transactions cause the number of shares trading to exceed the number of shares outstanding, which in turn allows broker-dealers to trade shares that don't exist. Others believe that the U.S. clearance and settlement system, and specifically the National Securities Clearing Corporation's ("NSCC") Continuous Net Settlement System ("CNS"), produces "phantom" or "counterfeit" securities by accounting for fails to deliver.

Naked short selling has no effect on an issuer's total shares outstanding. There is significant confusion relating to the fact that the aggregate number of positions reflected in customer accounts at broker-dealers may in fact be greater than the number of securities issued and outstanding. This is due in part to the fact that securities intermediaries, such as broker-dealers and banks, credit customer accounts prior to delivery of the securities. For most securities trading in the U.S. market, delivery subsequently occurs as expected. However, fails to deliver can occur for a variety of legitimate reasons, and flexibility is necessary in order to ensure an orderly market and to facilitate liquidity. Regulation SHO is intended to address the limited situations where fails are a potential problem (for example, fails in securities on a threshold list).

Similarly, CNS has no effect on an issuer's total shares outstanding. With regards to the contention that the U.S. clearance and settlement system, and specifically NSCC's CNS system, creates counterfeit shares, this is not the case. CNS is essentially an accounting system that indicates delivery and receive obligations among its members (i.e., broker-dealers and banks). These obligations do not reflect ownership positions until such time as delivery of shares are actually made. Ownership positions are reflected on the records of The Depository Trust Company ("DTC").

**Question 7.2: Does NSCC's stock borrow program ("SBP") create**

"counterfeit shares"?

**Answer:** The SBP was implemented in the late 1970s to allow NSCC to satisfy its members' priority needs for stocks that they do not receive because of fails. It is governed by NSCC rules approved by the Commission. Under the SBP, NSCC uses shares voluntarily made available to the SBP by some of its members to complete deliveries to members that did not receive their securities on settlement day. The SBP moves securities that are actually on deposit at DTC from the lending member to the NSCC member who did not receive securities. NSCC then records the lender's right to receive the same amount of shares that it loaned just as if the lender had purchased securities but not received them (i.e., the member lending the securities replaces the member receiving the loaned securities in the CNS system). The lending and delivery of shares through the SBP, however, does not relieve the member that has failed to deliver from its obligation to deliver securities.

The shares loaned by NSCC members for use in the SBP must be on deposit at DTC and are debited from members' accounts when the securities are used to make delivery. Once a member's shares are used for delivery to another member, the lending member no longer has the right to sell or relend those shares until such time as the shares are returned to its DTC account. Accordingly, NSCC's SBP does not create "counterfeit shares." In fact, the program facilitates the delivery of securities to buyers while maintaining the obligation of the sellers to deliver securities to NSCC. This outcome is consistent with the NSCC's obligation to facilitate the prompt and accurate clearance and settlement of securities transactions and in general to protect investors and the public interest.

### Question 7.3: Should NSCC buy-in all fails to deliver in CNS?

**Answer:** A "fail to deliver" in NSCC's CNS occurs when an NSCC member (e.g., a broker-dealer or a bank) fails to deliver securities on settlement date. There are many reasons why NSCC members do not or cannot deliver securities to NSCC on the settlement date. Many times the member will experience a problem that is either unanticipated or is out of its control, such as (1) delays in customer delivery of shares to the broker-dealer; (2) an inability to borrow shares in time for settlement; (3) delays in obtaining transfer of title; (4) an inability to obtain transfer of title; and (5) deliberate failure to produce stock at settlement which may result in a broker-dealer not receiving shares it had purchased to fulfill its deliver obligations. In addition, market makers may maintain temporary short positions in CNS until such time as there is sufficient trading to flatten out their position.

NSCC does not have the authority to execute buy-ins on behalf of its members. Moreover, forcing close-outs of all fails can increase risk in clearing and settling transactions as well as potentially interfering with the trading and pricing of securities.

*http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm*

Home | Previous Page                                                                 Modified: 05/06/2005

# Exhibit 5

<table>
<tr><td>

**DISTRICT COURT**

**CITY AND COUNTY OF DENVER, COLORADO**

</td><td></td></tr>
<tr><td>

Plaintiff:

    **X-CLEARING CORPORATION**, a Colorado corporation d/b/a Global Stock Transfer & Global Security Transfer

Defendants:

**DEPOSITORY TRUST CORPORATION**, a foreign banking trust corporation; **DOES 1-5**; and **BLACK CORPORATIONS 1-5**

</td><td>

▲    COURT USE ONLY    ▲

Case Number:

    **03 CV 1169**

    **Courtroom 2**

</td></tr>
<tr><td colspan="2">

**ORDER RE:**    **DEFENDANT THE DEPOSITORY TRUST COMPANY'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

</td></tr>
</table>

THE COURT having considered defendant's motion to dismiss or for summary judgment, the response, the reply, the court file and relevant authorities, and being sufficiently advised in the premises, finds, concludes and orders as follows.

1.    Plaintiff, X Clearing Corporation ("X Clearing"), is a stock transfer agent which has contracted with a number of companies, including Intergold Corporation, a Nevada corporation, to provide stock transfer services for their publicly traded stock. The defendant, Depository Trust Corporation ("DTC"), is the nation's principal security's depository which, among other things, effects and settles stock transactions for its participants which are, for the most part, large banks and brokerage houses. Generally, these participants are the beneficial owners of the stock deposited with DTC. DTC accomplishes these stock transactions through an electronic stock transfer system.

2.    The dispute underlying all of plaintiff's claims centers on whether an issuer of publicly-traded securities, such as Intergold, has the right, acting through its transfer agent (in this case the plaintiff), to exit those securities from the DTC system where it (issuer) is neither the legal nor beneficial owner of those securities. Based on its premise that it does have the right to effect the exit of Intergold's stock from the DTC system, plaintiff has asserted the following claims: First Claim for Relief -- Declaratory Judgment; Second Claim for Relief -- Injunction;

Third Claim for Relief -- Conversion; Fourth Claim for Relief -- Tortious Interference with Contractual Relations; Fifth Claim for Relief -- Conspiracy; and Sixth Claim for Relief -- Breach of the Covenant of Good Faith and Fair Dealing. The court has previously dismissed plaintiff's third and sixth claims. Defendant's motion to dismiss or for summary judgment is directed at all of plaintiff's remaining claims.

3.     Plaintiff has not submitted any competent evidence under Rule 56(e) contesting the Statement of Undisputed Facts in defendant's brief. Therefore, the court accepts those facts as undisputed for purposes of this order.

Long Arm Jurisdiction

The court denies defendant's motion to dismiss for lack of in personam jurisdiction. As the nation's largest securities depository, defendant does a level of business directly affecting Colorado residents sufficient to meet the requirements of due process and C.R.S. §13-1-124.

Preemption

4.     Defendant contends that all of plaintiff's claims, which are state law claims, must be dismissed because they are preempted by federal law. For reasons stated below, the court agrees.

5.     A claim based on state law is preempted by federal law, and thus must be dismissed for lack of subject matter jurisdiction, see City of Grand Junction v. Ute Water Conservancy District, 900 P.2d 81 (Colo. 1995), where:  (1) Congress has clearly stated a preemptive intent; (2) the federal statutory scheme is so pervasive as to infer preemptive intent; or (3) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. See Levitin v. Paine Webber, Inc., 159 F.3d 698, 705 (2d Cir. 1998). In the Securities Exchange Act of 1934 ("Act") as amended in 1975, Congress called upon the Securities and Exchange Commission ("SEC") to develop a "National Market System" which would facilitate, among other things, the economically efficient execution of securities transactions. See Orman v. Charles Schwab & Co., 688 N.E.2d 620, 622 (Ill. 1997). Toward that end Congress vested the SEC with the authority to regulate the operations involved in processing securities transactions. SEC Order, Release No. 34-47978, June 4, 2003 ("SEC Order") at 3541. In the exercise of that authority the SEC approved DTC's registration as a clearing agency in its efforts to facilitate the development of a National Clearance and Settlement System. Id. As a registered clearing agency, DTC has adopted rules under §19(b) of the Act. Those rules are subject to approval by the SEC.

6.     The following DTC proposed rule, which is relevant to plaintiff's claims, was adopted by the SEC Order:

-2-

> . . . [U]pon receipt of a withdrawal request from an issuer, DTC will take the following actions: (1) DTC will issue an Important Notice notifying the participants of the receipt of the withdrawal request from the issuer and reminding participants that they can utilize DTC's withdrawal procedures if they wish to withdraw their securities from DTC; and (2) DTC will process withdrawal requests submitted by participants in the ordinary course of business but will not effectuate withdrawals based upon a request from the issuer.

Id. at 35038. Although the SEC Order was not issued until June 4, 2003, the proposed rule it adopted reflected DTC's prior rules and procedures which did not permit issuers to exit shares from the DTC system. See SEC Order, p. 35038. Thus, it does not operate retroactively as to plaintiff's claims.

       7.     In the process of approving DTC's proposed rule above the commission stated:

> Securities deposited at DTC are registered in the name of Cede & Co. and are held beneficially for DTC participants, who in turn may hold the securities beneficially for their customers. Since DTC participants and their customers, not issuers, have ownership interest in the securities, DTC participants and their customers have the authority to determine whether to deposit securities with DTC or not. Participants deposit certificates with DTC in order to avail themselves of the efficiencies and safeguards provided by DTC. It would not be consistent with DTC rules to allow issuers to withdraw securities which they have not deposited at DTC or have no ownership interest.

Id. at 3542.

       8.     The Court concludes that plaintiff's state law claims are preempted. First, the above statutory scheme shows an intent on the part of Congress to preempt that area of law governing the operation of processing of securities transactions for publicly-traded securities. Second, each of plaintiff's remaining state law claims is premised on the right of an issuer, acting through a transfer agent, to directly exit securities from the DTC system. That premise conflicts with the SEC Order which was adopted to promote the Congressional goal of facilitating the economically efficient execution of securities transactions. Thus, prosecution of plaintiff's claims would stand as an obstacle to the accomplishment and execution of that goal. . Accordingly, all plaintiff's remaining claims are preempted by federal law, see Levitin, 159 F.3d at 705, and are dismissed for lack of subject matter jurisdiction.

       9.     Even assuming that plaintiff's state law claims were not preempted, the court finds that under the undisputed facts defendant is entitled to summary judgment on each of plaintiff's remaining claims based on the arguments presented in defendant's brief in support of

this motion and defendant's reply brief. The court further concludes that defendant is entitled to dismissal of all of plaintiff's claims because, for reasons set forth in defendant's motion and reply, plaintiff is not the real party in interest to assert those claims.

       10.    The court further finds that plaintiff's prosecution of its claims after the publication of the SEC Order on June 10, 2003 was frivolous and groundless. Therefore, defendant is entitled to its attorney fees incurred in defending plaintiff's claims from June 11, 2003 to the date of this order. See C.R.S. §13-17-201 et seq. Defendant may submit an attorney fees affidavit within 20 days.

       11.    The court enters final judgment of dismissal of all of plaintiff's claims for relief.

SO ORDERED.

Dated this ___3___ day of October, 2003.

                                     BY THE COURT:

                                     John N. McMullen
                                     District Court Judge

cc:    All parties.

◆JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Louis R. Capece, Jr., George Capece Sr. and George Capece, Jr.

## DEFENDANTS

The Depository Trust and Clearing Corporation; The Depository Trust Comany; and The National Securities Clearing Corporation

**(b)** County of Residence of First Listed Plaintiff  Monroe
(EXCEPT IN U.S. PLAINTIFF CASES)

*MAGISTRATE JUDGE*
*VITUNAC*

## 05-80498

County of Residence of First Listed  New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Alan C. Espy, 3300 PGA Boulevard, Suite 630, Palm Beach Gardens, FL 33410

Attorneys (If Known)

Matthew Triggs, Proskauer Rose LLP, 2255 Glades Road, Boca Raton, FL 33431 (561) 241-7400

*CIV-RYSKAMP*

**(D)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff |
|---|---|
| | (For Diversity Cases Only) and One Box for Defendant) |

*9:05CV80498-Ryskamp. vitunac*

|  | | | PTF | DEF | | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

§ Negligence cause of action (removal under complete preemption doctrine)

LENGTH OF TRIAL  2 days
via __ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE                                    DOCKET NUMBER

DATE  6/2/05

SIGNATURE OF ATTORNEY OF RECORD

FBN 086574S

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT  250.00        APPLYING IFP          JUDGE          MAG. JUDGE

534290